(Decided 18th December, 1889.)

---

The Baltimore and Ohio Railroad Company *vs.* State of Maryland, use of Asbury Savington.

*Railroad Company—Person killed by Engine—When case should be Withdrawn from the Jury—Evidence—Province of Jury—Province of Court.*

A boy nearly eleven years old, and smart and intelligent for his age, was killed by an east bound passenger train, running on a down grade at the rate of thirty or thirty-five miles an hour. He had been sent on an errand to the house of a neighbor some three or four hundred yards distant, and when he started he attempted to go up the tracks of the railroad, and his mistress, observing his course forbade his going on the railroad, and cautioned him to avoid the danger of the cars. She testified that when she heard the rush of the train, she ran to the front door to see what it was, and caught sight of the boy and the engine at the same time; that he was on the front of the engine, being tossed up, and scrambling with his hands, the engine being at that moment on the private crossing below the house. The engineer of the defendant testified that he did not blow the whistle for the crossing on that day, and never did so to his recollection; there was no whistling post requiring it; that when he first saw the boy running towards the house between the north and south tracks of the railroad, he was forty or fifty yards west of the

Baltimore and Ohio R. R. Co. *vs.* State, use of Savington.

crossing, and appeared to be running as rapidly as he could—at full speed; he could have stepped off at any point, and gotten out of the way of the train, without any trouble; he was not on witness' track at any point where he could see him, and if he had remained between the tracks he would not have been injured. The fireman who saw the accident as it actually occurred, testified that the boy was not on the track at any time until he got hit; that when the engine got within three feet of him, the little fellow stumbled, and fell right out on the pilot, and it threw him up, and he came down and lit on the flag staff; the flag staff broke off with him, and he fell to the ground. If he had not stumbled and fallen over, he would not have been hit. HELD:

That there was not such legally sufficient evidence of negligence on the part of the defendant as to warrant the submission of the case to the jury.

In matters of proof the existence of facts is not to be inferred from mere possibilities; there must be proof of the essential facts to fix liability upon a party charged with the commission of a wrongful act; a mere surmise that there may have been negligence on the part of the defendant will not justify the Court in submitting the case to the jury.

Juries cannot be allowed, however great the deference conceded to their province, to make mere conjecture or speculation the foundation of their verdicts. If there be no evidence upon which a rational conclusion may be based in support of the claim of the plaintiff, the case should be withdrawn from the jury; and to do this is a preliminary duty of the Court.

APPEAL from the Circuit Court for Carroll County.

The case is stated in the opinion of the Court.

The cause was argued before ALVEY, C. J., STONE, ROBINSON, IRVING, BRYAN, and McSHERRY, J.

*James A. C. Bond,* for the appellant.

*Charles B. Roberts,* and *William P. Maulsby,* for the appellee.

ALVEY, C. J., delivered the opinion of the Court.

In this case the action is brought against the defendant, in the name of the State as plaintiff, for the use of the father whose son was killed by what he alleges to have been the wrongful act, neglect or default of the defendant corporation. Code, Art. 67, sec. 1. The defendant pleaded that it did not commit the wrong alleged; and upon trial there was a verdict for the plaintiff, and judgment thereon. The defendant has appealed.

The accident happened on the defendant's road, at a point near Watersville, on the 23rd of August, 1888, about 1 or 2 o'clock in the day, and where no person, unconnected with the operation of the road, had a right to be. The boy who was killed, is represented to have been near or about 11 years old, and smart and intelligent for his age. The train by which he was killed was east bound, and was running on a down grade, at the rate of 30 or 35 miles per hour. It was somewhat behind time, and bore a signal for a following train on the same track. It appears that the boy was hired to a Mr. Unglebee whose house was situated immediately on the north side of the road, the road having two tracks, and the south track being the one upon which the train was running that produced the accident. It was a passenger train of seven cars. Just before the accident, Mrs. Unglebee sent the boy on an errand to the house of a neighbor, some three or four hundred yards distant, on the same side of the road as her own, but west from her house. When the boy started, he attempted to go up the tracks of the railroad, but Mrs. Unglebee, observing his course, called to him, and forbade his going on the railroad, and cautioned him to avoid the danger of the cars. The boy left the tracks of the road, and pursued his way on the north bank or side thereof; but on his return he got upon the tracks of the road, where he was overtaken by the train. Just east of and below the house of Unglebee

Baltimore and Ohio R. R. Co. *vs.* State, use of Savington.

there is a private farm way, crossing the railroad tracks, with bars upon the south and gate upon the north side of the railroad; and the proof is, that from this crossing a train can be seen approaching from the west some six or seven hundred feet.   The attempt on the part of the plaintiff was to show that the boy was struck on this crossing; but the attempt wholly failed.   The only witness examined on the part of the plaintiff who saw, or professed to have seen, the actual occurrence of the accident, was Mrs. Unglebee.   After relating the circumstances of starting the boy on the errand, and her direction to him to get off the railroad tracks, she says, "the next time she saw him was when she heard the rush of the train going east, when she ran to the door to see what it was, and just as she *first saw him he was on the front of the engine and revolving over to the side;* he was being tossed up and scrambling with his hands; that she caught sight of the boy and the engine at the same time: That when she first saw him on the engine, being tossed from one side to the other, the engine, *at that moment of time,* was on the crossing below the house; there was a locust tree in the yard that obstructed her sight somewhat; the boy was thrown in the ditch below the culvert; that she, the witness, immediately ran to the boy, and brought him up in her arms and laid him on the porch, where he died in a few minutes."   She further states that there was no whistle blown from the train as it approached the crossing; "that when she first heard the rush of the train, she was at the back door, and ran to the front door; it did not take her a second to get there; that when she first heard the rush of the train it was opposite to her door; that the train was running at a high rate of speed, much faster than usual."   "That while the boy was on the engine, it gave two little toots before he broke loose and fell into the middle ditch; that witness noticed, as the train passed, one of the men on

the engine sitting with his arm on the window, and thinks that he could have seen the accident.'' On cross-examination, this witness further stated, that the first sight she got of the boy, when she reached the door, ''was a peculiar motion low down on the crossing, and he revolved up, and kept revolving up, on the engine; and can't see any other way but that he was struck on the crossing; can't say whether he was standing up or not when she first saw him; *when she first caught sight of the boy he was against the front of the engine* and revolving around the side; he was right against the pilot.'' And further on, upon being questioned as to former accounts given of the occurrence, she says, ''I did say to Mr. Hall, 'right out there (pointing to the tracks above the crossing and opposite to a point midway between the two doors opening on the porch,) lies one of his suspenders where he was struck, and where the other one lies is where I picked him up;'" and she further said, that she ''did not know in what direction the boy was going when he was struck, and did not know whether he was coming from the bars, or was on the outside of the track, or was coming down the track from Jackson's,''— the house to which he had been sent on the errand by the witness. Lewis Unglebee, the husband of Mrs. Unglebee, was also examined by the plaintiff; but he saw nothing of the occurrence of the accident, not being at home at the time. He says that he saw a piece of the boy's suspender above the crossing.

This was the evidence, *and the only evidence furnished*, on the part of the plaintiff, to prove under what circumstances the boy was killed. That he was not in fact first struck on the crossing, is reduced to a certainty, when we consider the speed of the train and the position of the boy on the engine when first seen by Mrs. Unglebee; though it is not perceived that this fact would make any material difference in the case. Nor

do we understand counsel for the plaintiff now to insist that such was in fact the case. And if the defendant, at the close of the evidence for the plaintiff, had asked the Court to direct the jury that there was no evidence legally sufficient before them upon which they could find for the plaintiff, such direction could not have been refused; for at that stage of the trial there was not the semblance of a case made out. The defendant, however, did not pursue that course, but proceeded to examine witnesses to support the defence taken; and, among other witnesses, it examined the locomotive engineer and the fireman of the train that killed the boy. It is upon the testimony of these two latter witnesses that the plaintiff now mainly relies. The plaintiff in his brief says that "the facts on which the case turned and depends are to be found in the proof of defendant's witness, Furley, the engineer in charge of the locomotive which killed the boy."

Furley, the locomotive engineer, testified that when the train passed Unglebee's house on the 23rd of August, 1888, it was 40 or 45 minutes late, and was running at a speed of 30 to 35 miles per hour. He could have stopped the train, he supposes, within 175 or 200 yards, by applying all the means available. The space between the two tracks is 7 feet, and between the ends of the cross-ties of the two tracks 3 feet. His train was a mail train on the south track going to Baltimore; no train passed on the north track, at that point, between the hours of 1 and 2 o'clock that day; there would have been space enough between the tracks for anybody to have avoided danger from passing trains, walking or standing in the middle ditch, or the space between the ends of the ties; "witness was on the proper lookout as his train approached Unglebee's house; that his place is on the right of the engine, and that of the fireman on the left. That he did not blow the whistle, on the day in ques-

tion, for the Unglebee crossing, and never did so to his recollection; there is no whistling-post requiring it; has been running an engine on the road for 7 or 8 years, and never blew for that crossing, and never regarded the crossing as a public one. As the train was approaching Unglebee's on the 23rd of August, 1888, witness saw some person running between the north and south tracks, and appeared to be running as fast as he could, and when witness saw him the thought occurred to him that the person was trying to get to Unglebee's house before the train could pass him; in witness' opinion, when he first saw the person running down towards the house between the tracks, he was 40 or 50 yards west of the crossing; the person appeared to be running as rapidly as he could—at full speed: When witness first caught sight of the boy he supposes his train was 150 or 175 yards from him, as near as he can get at it; the boy was in the middle ditch, as it is called, between the north and south tracks, where witness first saw him; witness did not ring the bell or blow the whistle, as the boy was not in any danger, and he could have stepped off at any point; from the boy's action he could have stepped off and got out of the way of the train without any trouble; he was not on witness' track at any point where witness could see him, and if the boy had remained in the ditch between the tracks he would not have been injured; witness could have stood there; and the boy could have stepped on the north track in an instant.'' Witness did not see the engine strike the boy, as his view was cut off from objects on or near the track on the left of the engine; but when the engine was directly opposite Unglebee's house, the fireman said ''You struck that fellow;'' witness did not stop the train, but went on to Watersville, where he got off and requested that some person be sent up to Unglebee's to look after the person said to have been struck. In another part of his

testimony he says, that if he had seen the boy on his track, and saw that he was likely to stay there, he might have stopped, but he saw no necessity of stopping, as the boy was not on his track at any time. If he had seen the boy 150 yards ahead, he did not know that he could have brought his train to a stand still; "probably he could have got it slow enough so the boy could have escaped, if he had been on his track; but he never saw him on the track, and he had no reason to believe he would get on it." Much of the testimony we have recited was repeated on cross-examination.

Norris, the fireman on the train, was also examined, and he appears to have been the only witness who saw the accident as it actually occurred. He says that as the train was approaching Unglebee's he "saw a boy— could not tell whether he was a man or a boy—running down the track, right between the south and north tracks, right in the centre ditch; he was running in the direction of Unglebee's house: When witness first caught sight of him, he supposes the train was 175 yards from him; supposes the boy was 40 or 50 yards west of the crossing when he first saw him; he appeared to be running as fast as he could; he was not on the track at any time until he got hit, then he fell; the boy was hit right opposite the house; witness saw the engine get within three feet of him, and the little fellow stumbled and fell right out on the pilot, and it threw him up and he came down and lit on the flagstaff, and stayed there about a second more or less; the flagstaff broke off with him, and the boy fell to the ground." Witness saw the boy stumble, "and saw when he fell, and did not take his eyes off of him until he took those somersaults when he fell; witness then told engineer the boy was struck: The boy had every chance in the world to get away; if he had stayed where he was the engine would not have hit him; if he had not stumbled and fallen over he would

not have been hit; there was nothing whatever to pre-
vent the boy from going off on the other track; no train
was passing on that track at that time at that place.''

We have set out the testimony thus fully because the
first and principal question on this appeal is, whether
there was any evidence legally sufficient to be submitted
to the jury, from which they could find the existence of
negligence by the defendant, as the direct cause of the
injury complained of.

Upon the whole testimony, the plaintiff asked for
certain instructions, all based upon the assumption that
the evidence, if believed by the jury, was sufficient to
establish the fact of negligence by the defendant; but,
in lieu of the first prayer offered, the Court instructed in
terms of its own, and refused all the plaintiff's prayers,
except the second. The defendant offered several prayers;
by one or two of which the Court was asked to instruct
the jury that there was no evidence *legally sufficient* upon
which the plaintiff could recover; but the Court rejected
all the defendant's prayers, except the eighth and ninth,
and by the granting of which latter prayers the jury
were instructed that negligence was not to be inferred
from a failure to blow the whistle at the Unglebee's
crossing, nor because of the fact that the train was
behind time.

Upon the instructions granted, the case was submitted
to the jury; but upon what they based their verdict is
quite beyond the power of this Court to perceive. It is
clear enough that the boy was killed by a collision with
the engine, but it is equally clear that he was upon the
defendant's road where he had no right to be, and from
which he had ample opportunity to escape from all
danger. We are at a loss to perceive in what the im-
puted negligence of the defendant consisted. The men
in charge of the train were not bound to stop, or even
to slacken the speed of the train, unless they saw that

there was danger of collision with a person upon the track, who had no apparent opportunity of escape, or in regard to whom they saw there would likely be a collision. Nothing appears in this case to justify the conclusion that the men in charge of the train saw any such peril to the boy before the accident occurred; nor does it appear that they had any reason to suppose that he would place himself in a position of peril of collision with the approaching train. In matters of proof we are not justified in inferring from mere possibilities the existence of facts; there must be proof of the essential facts to fix liability upon a party charged with the commission of a wrongful act. And even a *scintilla* of evidence, or a mere surmise that there may have been negligence on the part of the defendant, will not justify the Court in submitting the case to the jury. There must be, in a case like the present, some reasonable evidence of well defined acts of negligence, as the cause of the injury complained of; and therefore it is incumbent upon the plaintiff to give some affirmative evidence of the existence of such negligence before he can ask that the case be submitted to the jury. *Whart. Neg., sec.* 421, and cases there cited. Or as clearly stated by the Supreme Court, in *Parrott vs. Wells, Fargo & Co.*, 15 *Wall.*, 524, 537, "No one is responsible for injuries resulting from unavoidable accident, whilst engaged in a lawful business. A party charging negligence as a ground of action *must prove it.* He must show that the defendant, by his act or by his omission, has violated some duty incumbent upon him, which has caused the injury complained of." Juries cannot be allowed, however great the deference conceded to their province, to make mere conjecture or speculation the foundation of their verdicts. If there be no evidence upon which a rational conclusion may be based in support of the claim of the plaintiff, the case should be withdrawn from the jury; and to do this is a preliminary duty of the Court.

Baltimore and Ohio R. R. Co. *vs.* State, use of Savington.

It has, however, been argued in support of the case of the plaintiff, that it was competent to the jury to accept and act upon such parts of the testimony of the witnesses for the defendant as they deemed proper, and to reject such other parts as they deemed unworthy of credit; and by so doing they might well have found that there was negligence on the part of the defendant. But there was really no conflict of evidence in the case, and nothing to disparage or discredit the testimony of any witness examined. But conceding the right of the jury thus to deal with the testimony of an unimpeached witness, before they could find a fact opposed to or in conflict with the testimony so rejected by them, they should have legal and competent evidence before them upon which to base their finding. The jury may refuse to give credit to the statement of a witness, but they are not at liberty to infer from the rejected testimony alone, and because they do discredit it, a fact the very reverse of what has been sworn to by the witness. Therefore, supposing the jury to have disbelieved the testimony of the witnesses for the defendant, or all such portions of it as tended to prove the non-existence of negligence on the part of the defendant, yet there is no portion of their testimony that tends to establish the existence of negligence, and consequently the case stands as it would have stood upon the testimony given on the part of the plaintiff alone; and that, as we have seen, wholly failed to make a case for the plaintiff. In our opinion there was error in refusing to direct the jury that there was no evidence before them legally sufficient upon which they could find for the plaintiff. The judgment, therefore, must be reversed.

*Judgment reversed.*

(Decided 18th December, 1889.)