THE BALTIMORE AND OHIO RAILROAD COMPANY *vs.* STATE OF MARYLAND, use of ELIZA GOOD, widow, and VALERIE GOOD, infant.

*Railroad Company—Action for Killing a Person—Negligence—Res gestae—Hearsay declarations—Evidence—Contributory negligence—Withdrawal of Case from the Jury.*

In an action against a railroad company, to recover damages for the killing of a person, where the declarations of S., an employé of the company, were purely hearsay as offered, and not part of the *res gestæ*, and therefore inadmissible as affirmative proof for the plaintiff, the fact that S. was afterwards called by the defendant, and the jury had the benefit of his denial of any such statements, does not deprive the defendant of the right to avail himself of such error on appeal.

If S. himself could have been asked, by way of laying a foundation for impeachment, if he had made these statements, they would only have been admissible as tending to discredit and impeach him, and would not have been evidence as tending to establish the fact to which they related.

Where the statement of a witness is not responsive to the question asked on cross-examination, and bears no relation to the subject about which he is asked, it ought, upon application, to be stricken out and excluded.

A statement of an employé of the defendant in an action for damages resulting from an accident, made the day after the accident, is inadmissible as evidence for the plaintiff.

In an action against a railroad company to recover damages for the death of a person killed by a train of the defendant at or near where the railroad crossed a public street, the only witness of the accident was M. the conductor of the train. Looking to his testimony, in connection with the circumstances detailed by the plaintiff's witnesses, he was absolutely uncontradicted, and his statement, if believed, made the case one of inexcusable recklessness and grossly contributory negligence on the part of the deceased. HELD :

Baltimore and Ohio Railroad Co. *vs.* State, use of Good.

1st. That as the circumstances did not contradict M., and no witnesses contradicted him, there was no reason for disbelieving the facts to which he testified.

2nd. That as but one inference could be drawn from the uncontradicted evidence of M. the case should have been withdrawn from the jury ; for if they believed M. they could render but one verdict, and that would be for the defendant, and if they did not believe M. their verdict still should be for the defendant, because the plaintiff's proof was insufficient to support a verdict for the plaintiff.

APPEAL from the Superior Court of Baltimore City.

The case is stated in the opinion of the Court.

The cause was argued before ALVEY, C. J., MILLER, ROBINSON, IRVING, FOWLER, McSHERRY, and BRISCOE, J.

*George Dobbin Penniman,* and *John K. Cowen,* (with whom was· *W. Irvine Cross,* on the brief,) for the appellant.

*Fielder C. Slingluff,* (with whom was *William T. Donaldson,* on the brief,) for the appellee.

IRVING, J., delivered the opinion of the Court.

On the evening of January 21st, 1890, I. F. S. Good was killed near the corner of Ostend street and Warner street—both public streets in the City of Baltimore.

This suit is brought in the name of the State, (for the use of his widow and child,) under Article 67, sections 1 and 2, of the Code of Public General Laws, against the appellant, upon whose railroad he was killed; and as is alleged, by the negligence of its operatives. The double tracks of the main stem of the Baltimore and Ohio Railroad Company run in the centre of Ostend street by permission of a city ordinance. It crosses Warner street; and near that crossing, and a few feet from Warner

street sidewalk, was a switch, used for the purpose of changing the trains from the north track to the south track when it might be necessary. This switch was worked by a lever from a tower house three hundred and seventy-five feet from the switch, off to the east. It is admitted that there was no light at this switch. At the Warner street crossing the appellant had placed safety gates as required by the ordinances of the city, and had also placed a watchman at the gates to attend to the working of them. This watchman had a watch-box near by. The arm of the gate reached across the sidewalk and fourteen inches further, and near the end of it was a telegraph pole, around which was a path that extended across to Ostend street. The theory of the plaintiff is that the gates being down, Good followed the path around the telegraph pole, and, crossing to Ostend street, was caught in the switch and held by the foot until the train of the appellant, moving eastward, passed over and killed him. To sustain this theory, the plaintiff proved that when Good was found he was not quite dead, but was unconscious; that one leg was attached to his body but had the heel crushed; that the man was disembowelled, and the other leg was cut off and the shoe and stocking torn from the foot; and that blood and flesh were scattered over the track and rails at or near the switch, and that some flesh was in the switch. Plaintiff's witness Schneider, (who had testified to seeing the shoe which had been cut off on the right side of the track going west, and that the other was on the foot of the leg that was taken by the train to the frog in front of Mike Kelley's, where it was taken out and put in a box: and that this frog was about seven yards west of Warner street; and that he heard Mr. Good cry, Oh! my! Oh! dear, which called his attention to the accident,) was asked on cross-examination, "Did you or did you not tell officer Gill that you did not

see the accident, as you were asleep at the time in the
signal tower?" To this he answered, "No sir. I can
prove it by the two operators; and furthermore I, heard
one of the operators say late in the same night when we
were sitting there and eating lunch, that he thought there
was something wrong, because he could not get the switch
closed." To this answer the defendant objected, and asked
the Court to rule it out; but the Court refused to do so, and
admitted it as evidence. Whereupon the appellant ex-
cepted, and the Court signed the same as his first excep-
tion. The second exception presents substantially the
same question. Witness Reeside, who was produced by
the plaintiff, was asked by plaintiff's counsel this ques-
tion: "Tell the jury what Mr. Stevens told you, if he told
you anything, and what he told you about the working
of the switch that night." The witness answered: "I
asked him next day, going up to the watch-house, how
the switch pulled. I asked him if it did not pull a little
stiffer than they usually had pulled, and he said yes."
To this question and answer the defendant objected, but
the Court overruled the objection, allowed the question
to be put, and the answer to go as evidence, and the ap-
pellant took the second exception.

The appellee admits that it was error to admit this
question and answer, and the voluntary and unrespon-
sive statement in the first exception, *at the time they were
propounded* and answered; but he contends that the error
was not a reversible one because subsequently Stevens
was called by the appellant, and the jury had the bene-
fit of his denial of any such statements, and therefore
the exception should not be maintained. Reliance for
this contention is placed upon *Wyeth vs. Walzl,* 43 *Md.,*
430, which case, counsel for appellee insists, decides the
identical question in his favor. In this he is mistaken.
There is a marked distinction in the two cases. In the
case at bar plaintiff is relying upon the declaration of

the switchman Stevens to prove that the switch did work hard; to raise the presumption that the deceased was caught in the switch, and held until killed; and he is relying on the proposition that he could have used these declarations of Stevens by way of impeaching him after he had testified for the defendant, and that, therefore, there was no ground of reversal, because improperly admitted, when admitted.   These declarations were purely hearsay as offered and not part of the *res gestae*, and therefore inadmissible as affirmative proof.   *Dietrich vs. Baltimore and Hall's Springs Railway Co.*, 58 *Md.*, 347. And if Stevens could have been asked by way of laying foundation for impeachment, if he had made these statements, they would only have been admissible as tending to discredit and impeach Stevens; and would not have been evidence as tending to establish the fact that the switch did work hard.   This Court expressly so decided in *Mason, et al. vs. Poulson, et al.*, 43 *Md.*, 176, where the Court said that in no instance had it been held to authorize such evidence to be treated as anything more than evidence going towards discrediting the testimony of the witness.   Were it otherwise the result would be the admissibility, in an indirect way, of the loosest and most unreliable hearsay.   The reason for such ruling rests on the principle stated by Mr. Justice BULLER so strongly and curtly that "the first speech being without oath, another oath, that there was such speech, makes it no more than a bare speaking, and of no value in a Court of justice."   *Buller's N. P.*, 294; 1 *Greenl. Ev.*, *p.* 172, *and note*.   The evidence admitted in Walzl's case cited by appellee's counsel, was not hearsay and the case is not in point.   There the plaintiff testified to the payment of a sum of money to a third person, and with that statement produced the third person's receipt which was admitted. The Court held that it was wrong to admit that receipt when offered in conjunction with the statement of the

plaintiff that he did pay the money; but that as the *giver* of the receipt was afterwards sworn, and stated that the money was not paid, it was competent to offer the receipt in reply to his statement. It not only contradicted the witness, but was *written evidence* that the money was paid, and would be conclusive of the fact of payment unless the witness could prove it was a felony or otherwise explain its being given without the money being paid, which it admitted was done. The statement of the witness in the first exception was not responsive to the question asked on cross-examination, and bore no relation to the subject about which he was asked. It was voluntarily obtended, by an evidently adverse witness, and the appellant had the undoubted right to ask, as he did, for it to be stricken out and excluded. 1 *Greenl. Ev.*, sec. 468; *Mayfield, et al. vs. Kilgour, et al.*, 31 *Md.*, 243. By objecting to its being stricken out, and afterwards relying on the testimony, the plaintiff made it his own proof; and, as to the second exception, the proof, objected to was offered in chief, of a statement made by the switchman the next day after the accident. By no authority can the action of the Court, admitting these statements of the witnesses be justified. The ruling was manifestly erroneous.

If these declarations of the switchman Stevens (which he denies) were admissible to show that the switch worked hard, they might tend to prove that there was a possibility that the accident occurred, as is supposed by the plaintiff; but it would not establish the fact; for "in matters of proof we are not justified in inferring from mere possibilities the existence of facts." *Baltimore and Ohio Railroad Co. vs. State, use of Savington,* 71 *Md.*, 599. "A wild speculation as to how and from what cause the accident occurred can not be allowed to stand for proof, or be made the basis of a verdict in favor of the party upon whom the burden of proof lies." *Balti-*

*more and Potomac Railroad Co. vs. State, use of Abbott, ante page* 158. *Excluding these statements attributed to* Stevens, the plaintiff offered no evidence tending to show in the slightest degree how the deceased was killed. True, there were some pieces of flesh in the switch, but they were not shown to be parts of the foot; and the heel was mashed up, and the leg down the inside of it, and flesh and blood were scattered all around; and how he came to be there to be killed, and by what negligence of the defendant he was killed, the plaintiff literally offered no proof; his theory was simple speculation unsupported by evidence; and if at the conclusion of his proof, and resting his case, the defendant had asked the Court to take the case from the jury for the want of legally sufficient evidence to sustain it, such prayer should undoubtedly have been granted.

Without doing so, however, the defendant offered several witnesses in defence, and among them the conductor Malone, who was the only witness that saw the accident and knew how it occurred. And the appellee's counsel frankly states that he relies largely on Malone's evidence to sustain his suit. Without Malone's evidence the case would be exactly covered by *Northern Central Railway Co. vs. State, use of Burns,* 54 *Md.*, 113; *State, use of Miller vs. Baltimore and Ohio Railroad Co.,* 58 *Md.*, 221; *State, use of Barnard vs. Phil., Wilm. & Baltimore R. R. Co.,* 60 *Md.*, 555, and *Baltimore and Ohio Railroad Co. vs. State, use of Allison,* 62 *Md.*, 479.

We will now consider whether Malone's testimony helps the plaintiff's case and gives him better standing before the Court and jury. He was the conductor of the train at the time of the accident, and says he was standing on the rear end of the caboose, the signal lights of which were both burning. He had a white light in his hand. "The brakeman was between the tender and caboose. After he got west of the switches,

as soon as he saw he had passed the west-bound switch, he gave the engineman a cross light to stop, and the switches were thrown from the tower; he told by the light changing from green to red; he waved his engineman to go back, and by the time he got in the mouth of the switch he saw Good starting to cross the track from the north side of Ostend street; he thought Good was not going to walk in front of the caboose, but probably he would go to the middle of the north bound track and stop there; when he saw that he was going to run over him, he signaled to the engineman to stop, but it was impossible to stop in the distance he had; by the time he got to him he caught hold of the lappel of Good's coat and held as long as he could, but the weight was too much for him and Good fell right across the south rail; witness jumped off caboose and signaled engineman to stop; and he ran about the length of the caboose past him; the caboose was about eight or ten feet from Good when he stepped between the rails; the caboose was coming towards him; he was walking across the tracks and stepped in front of the caboose. Witness hallooed three different times, 'look out there.' Good held his head down and appeared to be under the influence of liquor, for he was staggering around like a drunken man; did not know whether he was or not, but his outward appearance indicated that; Good did not say a word; witness called to him and Good continued to go on. He did not pay any attention to witness whatever; Good had just stepped inside the north rail of the south track when the train struck him; Good could have stopped on the north bound track and allowed the train to pass him; Good walked across the north track and tried to cross the south track, and stepped across the north rail of the south track in front of the caboose; the man's foot was not caught in the switch; he was walking across the track when he was struck; Good came from

the north; he was standing outside of the safety gate that blocks the foot-path, when witness passed Warner street going west; when witness first saw Good the caboose was entering the mouth of the switch, and Good had come around the telegraph pole, or between it, and was just starting across the track; witness hallooed to him three times, but Good paid no attention; there was no switch where Good stepped over the north rail of the south track; after the accident Stevens asked him what was the matter and he told him; witness told Broll and went and looked at the body; he then reported to the tower, and when he returned from the tower the body had been removed from the track; when he first saw the body nobody was visible but the watchman who was standing at the gates, and a little girl who was outside the safety gates on Ostend street; the gates were down when he passed going west, and when Good was run over." This is the whole statement of Malone in chief. On cross-examination he stated that the train was not running faster than four or five miles an hour, and that there were not more than two or three minutes between the time that they passed the safety gates (going west) where he saw Good standing, until he was hit by the train running east; and that he had his foot around the rail at the platform of the caboose when he caught Good by the lappel of his coat and tried to hold him up until they could stop; and that Good never said a word, and that he heard the engineer say after the accident, "Oh! my God! how did this happen?" and heard no other exclamation; that when he caught hold of him he tried to hold him until they could stop, but he could not hold him; that he saw Good start about where the telegraph pole is, to cross over the north track, and that the switches had been thrown before he started to cross the track. And on redirect examination he said that the switches were closed before Good started to cross the north

track, and that if they had not been, he could not have crossed over it. The appellee contends that it was negligence on the part of the company to have a switch on a public street, close to a public crossing, with no light to indicate its danger, and which was opened and closed by a man three hundred and seventy-five feet away. And that in addition to this it was negligence on the part of the company to have the safety gates so constructed that foot passengers, in passing around them, were thrown in direct line with the switch in crossing the street. He also contends that these gates instead of being closed and lifted as required by the passage of trains, were kept closed at night, and were only lifted when wagons wanted to pass; and that on the night of the accident they had been down all night. If the character of the switch, and the method of its working, and the omission to have a light at or near to it to indicate the danger could be regarded as negligence on the part of the company, to make it available as the ground of this action, a direct connection between this negligence and the accident would have to be shown. In other words, it would have to appear that the switch produced the accident, or helped to produce it. The only evidence proceeding from an eye-witness (and on whom appellee's counsel relies, he says, in a large degree,) testifies that the switch had nothing to do with it; and as opposed to that we have only the pieces of flesh in the switch, which were also scattered around, and the mashing of a heel, all which could as well have been done by the wheel of the car crushing and mashing it into the switch crevices. We have already said that excluding the statements imputed to Stevens, the switchman, there was nothing from which a reasonable inference could have been drawn as to how the accident could have occurred so far as plaintiff's testimony is concerned, and Malone does not support plaintiff's theory of the accident. There is a

failure therefore to connect the killing with the switch and its management. The contention with reference to the gates, and their construction and management, fails also to supply a direct connection between it and the accident. The gates were placed there by requirement of a city ordinance. They were intended to prevent accidents by preventing people from crossing the street while a train was passing or about to pass. Confessedly they were down, and this fact *prima facie* indicated a warning that a train was about to pass. It was a prohibition of persons to pass until they were raised. This, at least, was the natural inference to be drawn from their being closed; and the deceased should not have disregarded the warning they gave. But it is contended that as Good saw the train pass westward, he could not be supposed to have expected so sudden a return from the east, and that inasmuch as the gatekeeper or watchman was not there to give him information, he had a right to proceed in the use of the public road or street; and besides, it is contended that the habit of the watchman or gatekeeper to keep the gates closed at night until called on to raise them, and that he was at the time in his box asleep, and had to be waked up after the accident, was such negligence as entitles the plaintiff to recover. It does not appear that the deceased had any knowledge or any reason to suppose that the watchman's habit was to keep the gates down at night until called on to raise them. If he had any doubt on that subject, he should not have disregarded the warning which the gates gave him. If the gatekeeper or watchman had been present on the spot, he would have told him no more than the gates told him by being down—to wait. His absence, supposing him to have been absent, and even asleep in his box, made no difference, for Good had no right to assume and presume that the watchman was neglecting his duty. His absence cannot, therefore, directly con-

nect the accident with the gates. Except from Malone
we have no knowledge that he passed through that gate;
for no one else saw him. When he was last seen by any
one else he was on Mike Kelley's corner; so that without
Malone's testimony we would not know where nor when
he came on Ostend street and the railroad. If Malone's
testimony is to be credited, the train was in sight, and
on its return eastward when he started from the gate to
cross over; and he attempted to cross with the full
knowledge that the train was coming eastward down the
street he was crossing, or if he did not see it, if he had
stopped, looked and listened, as it was his duty to do
under the circumstances, he would have seen it, and not
risked his life unless he really meant suicide. Exclud-
ing Malone's testimony, we have said there was no evi-
dence to show to a reasonable mind how the accident
occurred, and that it occurred at all by any negligence
or want of care on the part of the appellant or its agents.
Looking to Malone's testimony in connection with the
circumstances detailed by the plaintiff's witnesses, he is
absolutely uncontradicted; and his statement therefore
if believed, makes the case one of inexcusable reckless-
ness and grossly contributory negligence. The *circum-*
*stances* do not contradict Malone, and no witnesses contra-
dict him; and therefore, as was said in Burns' case, there
was no reason for disbelieving the facts he testifies to.
Those facts being undisputed which he testifies to, but
one inference can be drawn from them, and the question
is therefore one of law for the Court, and the jury should
have been instructed that, if they believed Malone, the
plaintiff could not recover, for the case was one of con-
tributory negligence. *Baltimore and Ohio R. R. Co. vs.*
*Mali,* 66 *Md..* 60; *State, use of Harvey vs. Baltimore and*
*Ohio R. R. Co.,* 69 *Md.,* 344; *State, use of Dyrenfurth vs.*
*Balttmore and Ohio R. R. Co.,* 73 *Md.,* 374.

In *Thompson on Negligence,* 1179, the rule is thus laid
down: "Where the facts are undisputed, or where but

one reasonable inference can be drawn from them, the question is one of law for the Court; but where the facts are left by the evidence in dispute, or where fair minds might draw different conclusions from them the case should go to the jury.'' Here, as we have said, but one inference could be drawn from the uncontradicted evidence of Malone, and the case should have been withdrawn from the jury; for, if the jury should believe Malone, they could render but one verdict, and that would be for the defendant; and if they did not believe Malone, their verdict still should be for the defendant, because we have already said the plaintiff's proof was insufficient to support a verdict for the plaintiff. Excluding Malone's evidence, the case was an unexplained mystery as fully as in Burns' case and the kindred cases cited with it. Entertaining the views we have expressed, it is unnecessary to examine the prayers *seriatim.* As the case should have been withdrawn from the jury, the judgment will be reversed without *procedendo.*

*Judgment reversed.*

(Decided 16th March, 1892.)