## DAVID CRYSTAL ET AL. *v.* BALTIMORE AND BEL AIR ELECTRIC RAILWAY COMPANY.

*Suburban Electric Railway—Collision at Crossing—Absence of Signal—Contributory Negligence.*

Since the evidence of negligence must be affirmative, there can be no presumption, merely from the fact that the lights of an electric car were out after a collision, that they were not burning before the collision.                    p. 262

Evidence that no signal was given by the operator of a suburban electric car, before approaching a street crossing at which a collision with a truck occurred, would justify the submission of the case to the jury, unless those in the truck were guilty of contributory negligence.                    p. 262

In a suburban section of a city, where the rate of speed of electric cars is much higher than allowed in the city, and the probability and danger of a collision at a crossing are consequently much greater, more caution is exacted of those crossing the track.                    p. 263

In an action for damage to a milk delivery truck caused by a collision at a highway crossing of a suburban electric railway, *held* that the contributory negligence of the driver of the truck, whose view of the track was obstructed by the contents of the truck, in failing to stop, look and listen, and of the "helper," the driver's servant, who was standing on the footboard, in failing to look except when a considerable distance from the track, justified the taking of the case from the jury.
                              pp. 262-264

*Decided March 10th, 1926.*

Appeal from the Circuit Court for Harford County (HARLAN, J.).

Action by David Crystal and others, co-partners trading as the Crystal Farm Dairy, against the Baltimore and Bel

Air Electric Railway Company.  From a judgment for defendant, plaintiffs appeal.  Affirmed.

The cause was argued before BOND, C. J., PATTISON, URNER, ADKINS, OFFUTT, DIGGES, and PARKE, JJ.

*John L. G. Lee,* with whom was *Edwin T. Dickerson* on the brief, for the appellant.

*Thomas H. Robinson,* for the appellee.

PARKE, J., delivered the opinion of the Court.

David Crystal, Jacob Crystal and Louis Crystal, co-partners trading as the Crystal Farm Dairy, appellants, brought an action in tort to recover of The Baltimore and Bel Air Electric Railway Company, the appellee, damages sustained in a collision, on a public highway crossing, of the motor truck of the appellants with an electric railway car of the appellee.  There are two exceptions to the rulings of the *nisi prius* court on the testimony, and the third exception is to the court's action in granting the prayer of the appellee, that took the case from the jury at the close of the appellants' testimony on the theory of contributory negligence. The exceptions on the evidence are not mentioned in the appellants' brief, and were not urged on the oral argument, and we have not found that either of the rulings would justify a reversal.  The single question is, therefore, the propriety of withdrawing the case from the jury on the evidence before the court.

The appellants were engaged in the retail dairy business, and a part of the daily routine was the early morning delivery of milk in the suburbs of Baltimore, by means of a covered one-half ton Ford motor truck, from which the bottled milk and buttermilk were delivered to the houses of customers on their route.  The accident occurred on December 22nd, 1921.  The two occupants of the truck were the only witnesses to the accident who testified.  One placed the hap-

pening of the accident between five and a quarter of five in the morning and the other at half past five. The truck was transporting sixty gallons of milk in pint and quart bottles carried in cases, two or three cases of buttermilk, and some cases of empty bottles. The cases were packed on top of one another and so filled the truck that there was no room inside except for the driver of the truck, Louis Crystal, one of the appellants, who sat on the left side of the truck. The helper, Russell Cole, was compelled to stand outside on the foot-board, and carried the bottles from the truck to the homes of the customers. As the helper rode on the foot-board he clung to the side of the truck. The driver's view to his right was completely obstructed by the covered truck and its load, but the helper could see to the right from his position.

After making their deliveries of milk on Maple Avenue, Crystal drove the truck over the single railway track of the appellee on to the macadam surface of the Harford Road, and proceeded northward and parallel with appellee's single track railway, which occupied the eastern margin of the Harford Road, and whose "T" rails were laid on ballasted ties and projected above the surface of the Harford Road, so that the railway track was used exclusively for railway travel and could not be crossed except at the intersection of streets where highway crossings had been constructed. The truck had to travel on the Harford Road three or four blocks down grade from Maple Avenue to the entrance into Orlando Avenue, and had proceeded on its way to a patron's store, situated on the west side of the Harford Road, about three hundred feet south of Orlando Avenue, where the truck stopped for the helper to leave the milk. After the helper had delivered the milk, he returned to his place on the foot-board of the truck and remained there until after the accident. The helper stood facing towards the rear of the truck, on the foot-board or running board, holding on to the frame of the window on the side of the truck with his left hand and carrying in his right hand the milk bottle which he was to

serve to the next customer, who lived on Orlando Avenue. While he did not so specifically state in his testimony, the helper's description of his position made it evident that he was standing on the left front foot-board of the truck, which was on the same side of the truck as the seat of the driver, who himself stated that the helper was standing on the foot-board right next to him.

The testimony, however, is not specific as to the side of the truck on which the helper rode, but if the helper had been standing on the right front foot board, the conduct of the helper, which was imputable to the master, in not looking for or seeing the oncoming car as the truck approached the crossing, would have been more culpable than if it should be assumed that the helper was standing on the left front foot board. We shall, therefore, consider the case on the assumption that the helper was standing on the left front foot board, as this is the more favorable position for the appellant in the discussion of this case.

The truck was driven in low gear from where it had stopped on Harford Avenue, slowly drifting down the hill at not more than five miles an hour, in order to make the turn and the Orlando Avenue crossing at the same low rate of speed, because the railway crossing was rough and greater speed would throw the cases down and break the bottles. The morning was dark, but both the driver and the helper testify that the helper looked back and that "he could see to the south clear to the top of that little hill," which was a block or a block and a half south of Orlando Avenue. The driver estimated the distance of the truck from Orlando Avenue, at the point where the helper looked back, as being from seventy-five to one hundred feet, while the helper believed it was about one hundred feet. When the helper looked he did not see anything approaching on the track, and he said that the headlight of a street car could be seen for three or four blocks, and that if a car had then been coming along there with its headlight burning, the witness could have seen the advancing rays of the headlight without turning around.

On his cross-examination the helper was uncertain about the exact distance from the Orlando Avenue crossing when he looked back to see if anything was coming, but the witness knew it was a pretty good distance and in plenty of time to stop the truck, if he had seen anything coming.

The helper is positive that when he looked back he neither saw nor heard a street car coming on the railway from the south. He did not look again to the south, and while he could have seen a railway car approaching from the north by simply turning his head in that direction, he could not, in his position, see anything in front of the truck, and his view to the right was through the window in the curtains of the covered truck, as the body of the truck lay between him and the railway track, while the truck was on the Harford Road, and was, also, between him and the oncoming railway car from the time the truck started to go towards the crossing. The position of the driver made him even more helpless to guard against the dangers of the crossing. He was seated on the left of the truck, and could only observe the approach of a railway car from the north or on his left, because he could not see at all to his right from where he was driving on account of the curtains and his load. As he started to turn on his way over the crossing, the driver looked through the window in the end of the truck to see what was back of the truck, but he did not look to the right or south because, as he testified, "I couldn't see to the right." The driver depended entirely upon his helper, while standing on the footboard on the same side of the truck as the driver, to direct the driver's management of the truck in approaching and crossing the railway track.

Without either looking again at the railway track south of the crossing at Orlando Avenue, after the helper had looked at a point seventy-five or one hundred feet south of Orlando Avenue, the driver traveled this distance in second gear at not over five miles an hour; turned slowly to the right off the Harford Road into the entrance to Orlando Avenue, and had driven his car almost across the single rail-

way tracks when the northbound electric car of the appel-lee struck the back part of the truck and dragged it thirty-six feet along the northeast side of the track, demolishing the truck and pinning both occupants of the truck under the wreckage.

The evidence of the driver and helper tended to estab-lish that they heard no bell or other signal given of the ap-proach of the suburban street car nor any noise made in its propulsion; and that neither of them saw the street car or any light, except from their own truck, at any time before the accident.   There is no witness to testify that the car was without headlight or inside lighting or that its rate of speed was excessive.   The extent of the damage done to a light Ford truck in collision with a street car affords too conjec-tural a basis for a deduction as to the degree of speed at which the car was running.   Nor do we believe the evidence is sufficient to warrant the inference that there were no lights in the electric car before the accident.   There is nothing to indicate that the electric car had reached the top of the hill a block or a block and a half south of Orlando Avenue, when the helper took his only look at the track, from where he could see to the south to the top of the hill, although it was dark.   Neither he nor the driver ever looked again at the railway track to the south; and neither one saw the car before the impact of the collision.   The helper's back was to the front of the truck, which was between him and the railway track to the right of the roadway, and he stated that from his position he could not see anything ahead of the truck.   The driver of the truck could not see to his right; and, before he started to turn the truck to the right to go over the crossing, he looked back through the window in the rear, and later any light cast by the advancing car on the crossing would have probably been merged with that of the headlights on the Ford truck, as it spread over the crossing with the approach of the truck, and would explain why the driver did not see any light from the railway car's head-light on the crossing.

Testimony must have more than a speculative value before it can be regarded as of testimonial sufficiency to establish a material fact. And this principle is particularly applicable in the present connection because, in the driver's signed statement, he said, consistently with all the other testimony on the record, that, while lying on the ground after the collision, he noticed that all the car lights were out, but that he did "not know if they were out at time of collision, or if collision caused trolley to ·fly off." The evidence of negligence must be affirmative and there can be no presumption that the lights were not burning on the electric car. *Hatcher v. McDermott,* 103 Md. 78, 84; *Balto. & O. R. R. Co. v. State, use of Savington,* 71 Md. 590, 599; *Balto. & O. R. R. Co. v. Good,* 75 Md. 526, 531; *Phila., W. & B. R. Co. v. Burkhardt,* 83 Md. 516, 524; *Riley v. New York, etc., R. Co.,* 90 Md. 53, 58, 59; *United Rys. Co. v. Fletcher,* 95 Md. 533, 536; *Balto. & O. R. R. Co. v. Black,* 107 Md. 642, 661; *Cutler v. Standard Oil Co.,* 127 Md. 405, 410, 411; *Carnaggio v. Chapman,* 131 Md. 285, 289; *Lowenthal v. Backus Motor Co.,* 140 Md. 32, 37. However, there was proof of the failure of any signal having been given by the operator of the car before the crossing was reached, and the case would be for the jury, unless those in the truck were guilty of contributory negligence. Those who fail to use ordinary care, under all the conditions and surrounding circumstances, to avoid receiving an injury by collision with a suburban electric railway car, while crossing the railway track at a public highway crossing, are chargeable with contributory negligence, but the standard of such care cannot be absolutely fixed, because all care is relative to the circumstances, which in the very nature of things vary greatly.

The driver and helper bore to each other the relation of master and servant, and the negligence of the servant was imputable to the master, who was driving the truck. The early morning was dark, but both master and servant were experienced men and familiar with all the conditions of travel on the highways and crossings which were on their daily milk route. They were in a suburban section, where

the construction of the electric railway prevented its being used as a part of the highway, except at those intervals where crossings had been made for travel on intersecting streets; and where, for this reason and because of the nature of suburban railway service, the rate of speed is much higher than that allowed in the city, and the probability and danger of collision on a suburban railway crossing are, therefore, much greater, and, consequently, more caution is exacted of those crossing the railway track. *McNab v. United Rys. Co.,* 94 Md. 719, 723; *Meidling v. United Rys. Co.,* 97 Md. 73, 75; *Glick v. Cumb. etc. Ry. Co.,* 124 Md. 308, 315, 317; *Westerman v. United Rys. & Elec. Co.,* 127 Md. 225, 231.

Whatever may have been the negligence of the appellee, the evidence disclosed that the injury here complained of was directly caused by the contributory negligence of the driver of the truck. While the view of the track on either side of the crossing at Orlando Avenue was unobstructed, yet that was no advantage to the driver of the truck, because, while he was traveling both parallel with the track and across it, he could not see the railway track to his right on account of the complete obstruction afforded by the covered truck and its contents. The obstruction of the truck was, therefore, as effective, so far as the driver was concerned, as if the obstruction to his vision had been by intervening buildings or other permanent objects fixed in the soil, with this single but important difference, that the obstruction interposed and the danger created by the moving truck was obviable at the will of the driver by his merely stopping, looking and listening at the point where it would have been effective for his safety. Instead of so stopping, the driver of the truck went blindly ahead without seeing or making any effort to see, and with even the protection of his hearing diminished by the noise of the truck filled with bottles and boxes. *Garvick v. United Rys. Co.,* 101 Md. 239, 246. His testimony and that of his helper is that he relied on his servant for protection. But the servant was standing next to the master on the running board, and, while the servant could see to the right by looking through the right front window of the closed truck, the

servant only looked once, and that was when the truck was from seventy-five to one hundred feet south of the crossing where the accident occurred. The servant did not look again, and where and when he looked afforded no protection at the crossing, because the truck was running in second gear, at not more than five miles an hour, and, in the time it took for the truck to travel this distance, make the turn and go on the crossing, an electric railway car, if traveling five or six times as fast, at that early hour in the morning when all travel is lightest, would have gone not less than five or six hundred feet. Not only did the servant fail to take a second look, but the driver neither requested him, nor inquired, before they went on the crossing, if the track was clear. The obligation to exercise ordinary care is not fulfilled by looking once, but by continuing to look until all danger of a collision is past. If this were not the rule, ordinary caution at a distance from the track would excuse the subsequent failure to use such caution at the very point of danger. There can be no question that if either the master had stopped the truck near the track and looked and listened, or if the servant had continued to listen and to look at the track, the approaching electric railway car would have been heard or seen in time for the slowly moving light Ford truck to have been brought to a stop in ample time to have avoided the accident. The facts of this record present no new problem and the rule of law applicable to these facts has been so frequently expounded and applied in this court, that further discussion is unnecessary, but some further citations will be made of some of the illustrative cases. *Meidling v. United Ry. Co.,* 97 Md. 73, 76; *Manfuso v. Western Md. R. Co.,* 102 Md. 257, 262, 263; *McNab v. United Rys. Co.,* 94 Md. 719, 726, 727; *Glick v. Cumb. etc. Ry. Co.,* 124 Md. 308, 313, 318; *Phillips v. W. & R. Ry. Co.,* 104 Md. 455, 459, 460; *Garlack v. Elec. Ry. Co.,* 142 Md. 638, 641, 642; *State v. Wash. etc. Ry. Co.,* 145 Md. 285, 289.

Finding no reversible error on this record, the judgment will be affirmed.

*Judgment affirmed, with costs to appellee.*