322 F.2d 286
 MISSOURI-KANSAS-TEXAS REILROAD COMPANY, a corporation, Appellant,
v.
Gertrude INGRAM and United States of America, Appellees.
Gertrude INGRAM, Cross-Appellant,
v.
UNITED STATES of America, Cross-Appellee.
 Nos. 7138, 7139.
 United States Court of Appeals Tenth Circuit.
 Aug. 26, 1963.
 
 Jack L. Rorschach, Vinita, Okl., and G. Ellis Gable, Tulsa, Okl. (Gable, Gotwals & Hays, Tulsa, Okl., were on the brief), for Gertrude Ingram.
 Harry D. Moreland, Tulsa, Okl. (E. J. Doerner, Tulsa, Okl., and W. A. Thie, Denison, Tex., were on the brief), for appellant.
 L. K. Smith, Asst. U.S. Atty., (John M. Imel, U.S. Atty., was on the brief), for the United States.
 Before PHILLIPS, PICKETT and SETH, Circuit Judges.
 PHILLIPS, Circuit Judge.
 
 
 1
 Gertrude Ingram brought this action against the Missouri-Kansas-Texas Railroad Company, hereinafter referred to as the Railroad Company, and the United States to recover damages for injuries allegedly caused by the negligence of the defendants. Trial was has to the court and the court concluded that the United States was not negligent, that the Railroad Company was negligent, and that Mrs. Ingram was damaged in the amount of $8717.05. Judgment was accordingly entered for the United States and against Mrs. Ingram and for Mrs. Ingram and against the Railroad Company in the amount of $8717.05.
 
 
 2
 The Railroad Company has appealed, naming both Mrs. Ingram and the United States as appellees, and Mrs. Ingram has cross-appealed from that part of the judgment in favor of the United States.
 
 
 3
 On November 16, 1960, Welch, Oklahoma, was a flag stop for trains of the Railroad Company. That is, the trains normally passed through the town without stopping, unless they were signaled to stop to allow passengers to board.
 
 
 4
 At approximately 4:30 p.m. on November 16, 1960, Mrs. Ingram purchased a round-trip ticket from Welch, Oklahoma, to Paola, Kansas, from Mrs. Neal, the Railroad Company's station agent at Welch, and advised her she intended to board a train of the Railroad Company, due to pass Welch in the late afternoon. Mrs. Ingram had ridden that train many times before and it had always been flagged for her to board it.
 
 
 5
 Mrs. Ingram was advised by Mrs. Neal that the train had been delayed and would be two or three hours late; that she was going home and that she would have the mail messenger flag the train when it arrived. Mrs. Ingram left her suitcase in the depot and departed.
 
 
 6
 At approximately 7:00 p.m. Mrs. Ingram returned to the depot in an automobile driven by a Mrs. Smith. Mrs. Msith parked her automobile on the north side of the depot and Mrs. Ingram was admitted to the depot by the mail messenger. She got her suitcase and returned to the car to wait for the train.
 
 
 7
 It was customary to flag a train after dark by waving a burning newspaper. After waiting in the automobile for 20 to 30 minutes, Mrs. Ingram heard the train coming from the south and observed the mail messenger come out of the depot with a newspaper. She further observed him stand on the track and wave such paper, but from her location she could not see any light from it.
 
 
 8
 She then heard the train's whistle, picked up her suitcase, and walked southward between the depot and the tracks toward the point where she normally boarded the train. There were no lights burning outside of the station, but there was light coming through the side windows of the depot.
 
 
 9
 When she had walked approximately half the length of the depot, the head of the northbound train passed her. Mrs. Ingram realized from the speed of the train that it was not going to stop, and because of the wind from the moving train she turned her back toward it. While so standing she was struck on the left shoulder by a mail bag which had been thrown from the moving train. She fell to the ground at a point approximately midway between the two ends of the depot building.
 
 
 10
 The train's fireman saw a man and a woman in the train's headlight when the train was about 300 feet south of the depot. The man was flagging the train with something that 'could have been a white piece of paper.' The fireman advised the engineer of the signal; the engineer brought the train to a stop north of the depot and backed up to the depot. Neither the engineer nor the fireman observed any lights outside the depot.
 
 
 11
 The Welch depot is a building 84 feet in length and is located on the east side of the Railroad Company's double northsouth track. The area between the building and the track is graded and covered with gravel and cinders. Such graveled area extends from a point north of the depot to a point approximately 189 feet south of the depot. There is a sign 130 feet south of the depot on the east side of the track, which reads, 'Caution, look out for mail bags when train passes.' 189 feet south of the depot on the east side of the track there is a crane known as a mail grab from which the passing trains pick up mail without stopping.
 
 
 12
 The mail clerk on the train was customarily advised by the conductor in advance when the train was to stop at Welch to discharge passengers, but he had no way of knowing in advance whether the train was going to stop in Welch to allow passengers to board it. The first warning the clerk would have of a flag stop would be a decrease in the speed of the train as it approached the depot. If the train slowed down the clerk retained the mail and handed it to the mail messenger in the depot, but in the event the train did not slow down he generally kicked the mail out immediately after he felt the impact of the mail being picked up by a hook on the mail car from the mail grab.
 
 
 13
 On the night of November 16, 1960, the mail clerk had no advance notice of a stop in Welch. The train passed a switch approximately 7000 feet south of the depot at a speed of 60 miles per hour or more. The clerk went to the door of the mail car to be sure that the mail to be dispatched at Welch was in order. Such dispatch consisted of a mail pouch about one-third full, a bundle of newspapers and a mail sack containing three bundles of paper. The mail sack and its contents weighed approximately 15 pounds and the entire dispatch weighed 35 or 40 pounds. The pouch, newspapers and mail sack were not tied together.
 
 
 14
 For at least a quarter of a mile as the train approached the Welch depot the clerk stood in the doorway of the mail car watching for a lantern placed on the mail grab by the Welch mail messenger and watching to determine that no one was in the area where the mail was to be dispatched. While watching, he stood behind a glass windshield known as a cinder guard and wore colored goggles to protect his eyes from dust and cinders and to permit him to see clearly. However, he turned away and ceased looking when the train was 200 or 300 yards away from the depot. At that time, because of the darkness, he could see only the dark outline of the depot and was unable to see Mrs. Ingram. After turning away, he did not again look to see if any person was in the area where the mail was to be dispatched. As he felt the impact of the mail bag on the hook he kicked the mail dispatch out of the mail car. He looked back as the train passed the depot and saw the mail sack skidding along the ground.
 
 
 15
 The method used by the mail clerk to deliver the mail was a commonly used and accepted method which he had used for 20 years. He had never hit anyone with a mail sack before, but knew that if someone was in the area where the mail was dispatched he might be struck by a mail sack kicked off of the train. On other occasions he had observed dispatches skid along the ground after they had been kicked off the train, but they had always hit the south end of the depot and stopped.
 
 
 16
 The job of the mail messenger is a contract job with the United States. It was not his duty to flag trains, but he did so frequently when asked by Mrs. Neal as an accommodation to her. After trying to flag the train for Mrs. Ingram, the mail messenger went behind a coal house 40 feet south of the depot, because he 'could get hit by the mail.' He saw the mail sack slide northward until it passed the corner of the depot and went out of his range of vision.
 
 
 17
 Mrs. Neal customarily warned people to 'stay back until the train stops' and testified that she felt sure she had so warned Mrs. Ingram on other occasions, but Mrs. Ingram testified that she had never been warned to stand back or to watch for mail sacks.
 
 
 18
 Mrs. Ingram was taken to a hospital on the evening of November 16, 1960, after the accident, where she was examined by Dr. Beine. His examination disclosed an impacted fracture of the head of the humerus bone of the left arm, a long-line fracture of the shaft of such bone, swelling and discoloration of the left leg and contusions on the left side of her face. She was in a semi-shock condition. The following day a circular or hanging cast was applied from just below the shoulder joint to a point midway between the elbow and the wrist. Mrs. Ingram wore the cast for eight weeks and was kept in the hospital for four days.
 
 
 19
 The first few days after her injury Mrs. Ingram was 'having quite a bit of pain' and was given 'rather strong' pain pills. She was given muscle relaxing pills for the remainder of the time she wore the cast. After removal of the cast Mrs. Ingram was given ultra sonic therapy and was advised to do exercises at home. She was still under treatment at the time of the trial.
 
 
 20
 Dr. Beine testified that Mrs. Ingram's injury had aggravated a previously existing arthritic condition; that her left shoulder joint was about 20 per cent permanently disabled and that she had about 10 per cent permanent disability over her whole body as a result of her injury.
 
 
 21
 Mrs. Ingram testified that she was 72 years old at the time of the accident; that after she was released from the hospital it was necessary for her to stay in her daughter's home until April, 1961; that she had 'lots of pain'; that it was difficult to sleep; that she was still having pain; that she was unable to do much housework or gardening as a result of her injury; and that she was unable to do much with her left arm.
 
 
 22
 The parties stipulated that Mrs. Ingram incurred as proper items of expense $117.05 for hospitalization, $251 for medical care and $800 for convalescence. In addition thereto she paid Dr. Beine between $300 and $350 for medical services.
 
 
 23
 The trial court found that Mrs. Ingram suffered damages in the amount of $1717.05 for past and future medical expenses and $7000 for pain, suffering and permanent injuries.
 
 
 24
 The trial court further found that the mail clerk had no notice that the Railroad Company had sold a ticket to Mrs. Ingram or that the train was to be flagged to allow her to board; that the mail clerk prepared his mail bag for dispatch and kicked it off the train at Welch in the usual and customary manner and as had been done for many years without causing injury to anyone; that the United States was not negligent; that the Railroad Company failed to furnish Mrs. Ingram with a safe place to wait for the train; that it failed to warn her of the danger in waiting for the train by the track; that it failed to flag the train for her to board; and that the accident was a result of the Railroad Company's negligence in not stopping the train or preventing Mrs. Ingram from being near the track when the train failed to stop.
 
 
 25
 Mrs. Ingram contends that the trial court erred in finding that the United States was free from negligence.
 
 
 26
 As a general rule customary methods do not furnish a test which is conclusive on the question of whether due care has been exercised. Conformity to such customary methods in merely a circumstance to be considered together with other circumstances in determining whether due care has been exercised.[1]
 
 
 27
 In Sanders v. C. P. Carter Const. Co., 206 Okl. 484, 244 P.2d 822, 825, the Oklahoma Supreme Court stated:
 
 
 28
 "In determining negligence, the standard is due care, and such standard is not fixed by custom, although failure to observe custom may be evidence of negligence, and custom, while it may assist in determination of what constitutes due care, is never a substitute for due care."
 
 
 29
 Thus, the fact that the mail clerk dispatched the mail in the normal and customary manner does not of itself require a determination that he acted with due care, but is merely a circumstance to be considered in making such determination.
 
 
 30
 Every person is under a duty to exercise due care in using that which he controls so as not to injure others.[2] but in order for such duty to arise, the person to be charged therewith must have knowledge or notice that his act or omission involves danger to another.[3] The mail clerk's own testimony showed he had knowledge that if someone was in the mail dispatch area when he kicked out the mail sack he might be injured. There was a duty on his part to exercise due care to prevent injuries to such persons by looking for them before kicking the mail sack out.
 
 
 31
 The mail clerk's testimony further shows that he failed to exercise such due care in that he stopped looking ahead when he was 200 or 300 yards from the Welch depot; that at such time all he could see was the dark outline of the depot itself and that he could not see Mrs. Ingram because of the darkness. He stopped looking before he had reached a point where it was possible for him to see that for which he was looking. It would have made no difference if he had not looked at all.
 
 
 32
 It was his duty to continue looking as he approached the mail dispatch area[4] and especially just before he kicked off the mail, and had he done so, he would have seen Mrs. Ingram at the point where she waited to board the train. His failure to look was negligence.[5]
 
 
 33
 We are therefore of the opinion that the mail clerk's uncontroverted testimony shows that he knew of the danger to persons who might be in the mail dispatch area when he kicked the mail sack out of the train, knew he had a duty to be on the lookout for such persons and failed to exercise due care in looking out for such persons.
 
 
 34
 The Railroad Company contends that its negligence, if any, merely furnished the condition by which Mrs. Ingram's injury became possible and that the subsequent act of the mail clerk kicking the mail sack off the train was the intervening and proximate cause of Mrs. Ingram's injury.
 
 13 Okl.St.Ann. 32 provides as follows:
 
 35
 'A carrier of persons for reward must use the utmost care and diligence for their safe carriage, must provide everything necessary for that purpose, and must exercise to that end a reasonable degree of skill.'
 
 
 36
 And the Railroad Company was obligated to exercise such utmost care and diligence for Mrs. Ingram's safety at the time of her injury, even though she had not yet boarded the train.[6]
 
 
 37
 The record clearly supports the findings of the trail court that the Railroad Company failed to exercise such care in that it failed to warn her of the danger of waiting for the train near the track and failed to flag the train.
 
 
 38
 Where separate or independent acts of negligence of two persons combine to produce directly a single injury, each is responsible for the entire result, even though the neglect of one alone might not have caused the injury,[7] and where original negligence continues and exists at the time of the injury, a concurrent act of negligence on the part of another wrongdoer is not independent but concurrent negligence for which both wrongdoers are liable.[8]
 
 
 39
 It was the combined negligence of the Railroad Company and the mail clerk which caused Mrs. Ingram's injuries, and had either of them used due care in performing the duty owed to her, her injuries would not have occurred.[9] Further, the negligence of each of them continued and existed at the time of the injury.
 
 
 40
 The Railroad Company relies upon Stephens v. Oklahoma City Ry. Co., 28 Okl. 340, 114 P. 611, 33 L.R.A.,N.S., 1007, to support its contention that the act of the mail clerk was the intervening proximate cause of Mrs. Ingram's injuries. In that case the plaintiffs alleged that they were struck by a fire wagon as they were returning to the sidewalk after a street railway car of the defendant had failed to stop for them to board. The trial court sustained a demurrer to the complaint and the Oklahoma Supreme Court affirmed on the ground that the negligence of the Railroad Company was not the proximate cause of the plaintiffs' injuries, since the Railroad Company could not reasonably have foreseen that the injuries which occurred would follow from its negligent acts.
 
 
 41
 Here, the injuries sustained by Mrs. Ingram are the very type of injuries which caused the duty of the Railroad Company to arise. That this type of injury was anticipated by the Railroad Company is shown by the testimony of Mrs. Neal that it was her practice to warn passengers to stay in the building until the train had stopped.[10]
 
 
 42
 We are of the opinion that Mrs. Ingram's injuries were proximately caused by the concurrent negligence of the servants of the Railroad Company and the United States, and that they are jointly and severally liable to her therefor.
 
 
 43
 The contentions that the damages awarded Mrs. Ingram were excessive and not supported by the evidence are without merit. There is ample evidence in the record to support the amounts found by the trial court.
 
 
 44
 The judgment is affirmed as to the Railroad Company and reversed as to the United States, with instructions to enter judgment for Mrs. Ingram in the amount of $8717.05.
 
 
 
 [1]
 65 C.J.S. Negligence 16, pp. 405, 406
 
 
 [2]
 Electric Supply Co. v. Rosser, 88 Okl. 220, 214 P. 1068, 1069; 65 C.J.S. Negligence 4b. (2), p. 341
 
 
 [3]
 Larrimore v. American Nat. Ins. Co., 184 Okl. 614, 89 P.2d 340, 345; 65 C.J.S. Negligence 5, pp. 350, 351
 
 
 [4]
 Shapiro v. Grabosky, 320 Pa. 556, 184 A. 83, 84; Crystal v. Baltimore & B. A. Electric Ry. Co., 150 Md. 256, 132 A. 629, 632; Temple Lumber Co. v. Living, Tex.Civ.App., 289 S.W. 746, 748; See also: O.C. Cab Service Co. v. Askew, 183 Okl. 6, 79 P.2d 811, 812
 
 
 [5]
 Cabe v. Langley, Okl., 348 P.2d 316, 319
 
 
 [6]
 Fullgraf v. Oklahoma Ry. Co., 188 Okl. 592, 111 P.2d 1072, 1074; Baker v. Hines, 88 Okl. 266, 213 P. 313, 314
 
 
 [7]
 Cook v. Black, Okl., 310 P.2d 774, 775; Oklahoma Ry. Co. v. Ivery, 201 Okl. 245, 204 P.2d 978, 982; Ordner v. Reimold, 10 Cir., 278 F.2d 532, 534
 
 
 [8]
 Missouri Motor Distributing Co. v. Barker, 170 Okl. 183, 39 P.2d 544, 545; City of Altus v. Wise, 193 Okl. 288, 143 P.2d 128, 131; Turner v. Gallagher, okl., 371 P.2d 733, 736; Ordner v. Reimold, 10 Cir., 278 F.2d 532, 534
 
 
 [9]
 St. Louis & S.F.R. Co. v. Bell, 58 Okl. 84, 159 P. 336, 339, L.R.A.1917A, 543; Cleveland v. Stanley, 155 Okl. 272, 9 P.2d 10, 11
 
 
 [10]
 Barnum & Richardson Mfg. Co. v. Wagner, 64 Ill.App. 375, 377; Atherton v. Kansas City Power & Light Co., 356 Mo. 505, 202 S.W.2d 59, 62; 65 C.J.S. Negligence 5a., p. 352