# BALTIMORE & OHIO RAILROAD COMPANY *vs.* STATE OF MARYLAND, use of LAURA C. BLACK, ET AL.

*Objection to Question as Leading—Collision of Wagon with Train at Railway Crossing—Evidence—Right of Trial Judge to Exclude Evidence on His Own Motion—Discrediting Party's Own Witness —Overdue Train—Lack of Evidence as to Cause of Injury.*

The objection to a question as leading must be made at the time it is asked and before it is answered. The objection must be made on that ground and not generally.

A question is not necessarily objectionable as leading because it may be answered, Yes or No.

Upon the trial of a case where a vital point in dispute was whether a wagon had been struck by the engine of a passing train, or whether the collision was between the wagon and the rear cars of the train, a witness who was sitting in a shut-in room, nearly two hundred feet from the point of· collision, cannot be allowed to testify that he could tell from the sound where the engine was at that time, since such evidence is merely the conjecture or opinion of the witness.

In an action to recover damages for an injury at a railway crossing, evidence is admissible to show the distance at which a man in a wagon near the track at that point, could see an approaching train, and how the dampness of the atmosphere would affect the sound of the train.

When a man driving a vehicle was struck by a train at a railway crossing, evidence is not admissible that he was generally and habitually a careful driver, for the purpose of proving that he was not guilty of contributory negligence on that occasion.

In an action to recover damages for a death alleged to have been caused by defendant's negligence, evidence as to whether the deceased was a prudent and economical man, is admissible because relevant as to the pecuniary loss sustained by the plaintiffs.

The Judge presiding at a trial is not a mere moderator between the parties, but has active duties to perform in seeing that the truth is impartially brought out. Hence, it is his privilege, and may be his duty, to examine a witness or to recall him to supply an omission of proof necessary to do justice in the case.

The Judge presiding at a trial may on his own motion exclude irrelevant and incompetent evidence, but this power should be exercised very cautiously.

Md.]                                    Syllabus.

When a witness originally called by the plaintiff is afterwards called as a witness by the defendant, the plaintiff cannot offer any evidence for the purpose of discrediting him, because by first offering the witness, he represented him as being worthy of belief.   The witness may however be contradicted as to any material fact.

The running of an overdue train at high speed over a crossing in the country is not in itself evidence of negligence on the part of the railway company.

Plaintiff's deceased, driving in a wagon on a dark and foggy night, was killed at a railway crossing, along side of a station, by a freight train. There was no eye-witness of the accident.   The train was halted at the next station and an examination of it made which showed no marks on the engine or pilot, but which did show marks of a contact with some external object upon the three rear cars of the train.   The deceased was thrown upon the platform of the station at the crossing together with the wheels of one side of the wagon and some of the flour which it contained.   The other side wheels were uninjured, as was also the horse.   The body of the wagon was found close to a signal-post on the same side of the track.   The evidence was conflicting as to whether the head-light of the engine was burning, and as to whether a whistle or bell was sounded for the crossing.   *Held*, that the physical facts of the case clearly show that there was no collision of the engine with the wagon, that therefore the alleged negligence of the railway company in not blowing a whistle or having a head-light on the engine, if found to exist, was not the cause of the injury, and that since there is no evidence of any negligent act or omission on the part of the defendant which did cause the injury, the case should have been withdrawn from the jury.

*Decided April 1st, 1908.*

Appeal from the Circuit Court for Washington County, (KEEDY, J.), where there was a verdict for the plaintiff for $9,249.

The cause was argued before BOYD, C. J., BRISCOE, PEARCE, BURKE and WORTHINGTON, JJ.

*James A. C. Bond* and *Francis Neal Parke*, for the appellant.

*Hammond Urner* and *Charles D. Wagaman*, (with whom was *Frank L. Stoner*, on the brief), for the appellees.

PEARCE, J., delivered the opinion of the Court.

This is an action brought in the Circuit Court for Freder-

ick County in the name of the State for the use of the widow and children of Henry S. Black, against the Baltimore and Ohio Railroad Co., for the alleged negligent killing of said Henry S. Black.   The case was removed for trial to the Circuit Court for Washington County where a verdict was rendered by a jury in favor of the equitable plaintiffs for the sum of $9,249, proportioned by the jury under the statute, in their discretion, among the equitable plaintiffs.   Judgment was entered upon this verdict, and from that judgment this appeal is taken.   The record contains thirty exceptions noted by the defendant.   Of these, twenty-eight relate to the admission of evidence; the twenty-ninth is to the overruling of defendant's special exceptions to the plaintiff's first prayer, and the thirtieth to the granting of the plaintiff's five prayers, and the rejection of the defendant's eight prayers.   The case is unusual in two respects; first in that no one actually witnessed the accident, and therefore no one can testify *from actual knowledge* as to the conduct of the deceased at the time of the accident, or as to its cause; and second, in the peculiar and extraordinary character of what may be termed the physical evidence tending to show how the accident was occasioned.

The question of the defendant's alleged negligence and of the causal relation of such negligence to the death of Henry S. Black depends upon principles firmly established in this State, but in order to an intelligent understanding of their application, it will be necessary to state the facts as they appear in the record, with some fullness.

As the prayers refer to the pleadings, it should be stated *in limine*, that the *nar.* contains two counts, each charging that the defendant so negligently operated and managed a certain engine and train of cars running upon its tracks, as to cause the death of the deceased while driving in his wagon upon a public highway, and while using due care and caution on his part.   In each count, *the particular manner* in which the death is charged to have been caused is, that "*defendant negligently and recklessly forced and drove said engine and cars upon, over and against the said Henry S. Black.*"

The deceased was a farmer forty-three years of age, an industrious, exemplary man, in good health and in possession of all his faculties.   He lived at Buckeystown about a mile from the crossing at Lime Kiln station on the B. & O. R. R. where he was killed on December 19th, 1906, about 6:35 in the evening.   Lime Kiln station is about six miles south of Frederick.   About four o'clock that afternoon he called at the office of Wm. J. Grove at Lime Kiln station to see Mr. Grove's father, but not finding him there, he told Wm. J. Grove he was going to Frederick, and would stop on his return from Frederick.

Otis Smith was at Lime Kiln station that evening about six o'clock.   He left there about 6:20 to drive to his home, and a few moments later met Mr. Black driving towards the station.   This is the last time he is known to have been seen alive by any one.   To reach this station, he had to leave the pike, and go north on a county road, the distance from the pike to the crossing at the R. R. station, being about 800 yards, and according to Smith's testimony Black was about 200 to 300 yards from the railroad crossing when they met. He also testified that when the train passed Lime Kiln station, he had passed the crossing next below towards Baltimore, about 500 yards distant, and that he saw the engine, "and the only way he could designate it was by the sparks flying out of the smoke stack."

Wm. J. Grove testified that the evening of the accident was very dark and foggy; that at the time of the accident he was sitting at his desk in his office on the north side of the railroad 50 or 60 yards east of the crossing, when he heard a crash, and thought the train had jumped the track, but it kept on going and did not stop, thundering by at a rapid rate. He stood some little time at the window to see if the train would stop, and then walked back to his seat, when some one rushed in and said a man was killed, and he said he would bet it was Black.   He said he heard the train coming and a few seconds later, about the time it reached the crossing, he heard the crash; that as soon as he learned a man had been killed

he went out and found Black's body lying on the platform close by the target pole, within a foot of the west end of the platform, and right close to the south side of the south track, with his head to the east, his head mashed, and his head and body covered with flour; that the wagon was right up against the target pole, as if locked on it, the left wheels next the track being smashed to pieces, but the wheels on the other side uninjured; that seeing the wagon was liable to occasion further danger in its position, he telephoned first to Frederick Junction and then to Riehl's Mill to stop the train; that they had killed a man, and that he caught and stopped the train at Riehl's Mill, within two or three minutes after the accident. He said he could see a train from his office window at a distance of half a mile, and could hear the whistle or bell at the signal post 400 or 500 yards west of the crossing, but that he heard neither whistle nor bell on that occasion. He testified that Mr. Black had in his wagon a sack of flour and a couple of pairs of boots which were scattered over the platform.

Randolph Crampton, colored, was going that evening from Buckeystown east to Lime Kiln station, and was walking on the south side of the track as the train passed him 300 or 400 yards east of Lime Kiln station. He said it was running very fast and did not whistle or ring either for Lime Kiln crossing or the next crossing east, but he did not see whether there was a head light on the engine.

Earl Bowman, colored, was walking west on the platform at Lime Kiln station at the time of the accident, and he testified as follows:

"At the time, I was going west down the platform in front of the passenger station, I saw a train passing the station.

Question. Where was this train when you first saw it?

Answer. It had not got to the station yet.

Q. About how far was it from the station when you first saw it?

A. Twenty feet, something like that.

Q. Did you see Mr. Black?

A. No sir, I did not see him.

Q. What did you see after the train passed the crossing?

A. After the train—before the train got to me, I seen the wheel coming on the platform.

Q. Before what part of the train got to you?

A. The engine.

Q. You say you saw a wheel coming towards you?

A. Yes sir.

Q. How far did the wheel come towards you, and how far were you from the wheel when you first saw it?

A. I was not very far from it, over on the side of the banisters.

Q. What banisters?

A. On the side platform.

Q. Tell the jury where those banisters are located with reference to the track?

A. They are on the right hand side.

Q. The right hand side of what?

A. Going up the platform. The banisters are along the edge of the platform next to ticket office.

Q. Which way was the wheel coming, east or south?

A. Coming east, the way the train was coming.

Q. What kind of a wheel was it?

A. One of the wagon wheels.

Q. How is it about that crossing with reference to being dark or light?

A. It is pretty dark around there.

Q. How did you find out where this wheel came from, and if so, how did you find out?

A. I found out after I went down there and seen the wagon and the man lying there. The wagon was tangled up into the signal post. This was about five minutes after the train passed. I saw the horse after the train passed standing between the two tracks with his head to the east.

The preceding part of this witness' testimony has been given just as it fell from his lips, because of its importance.

He further testified that the night was dark and foggy, and that he did not see any headlight on the engine, nor did he hear any whistle or bell as the train approached.

On cross-examination he testified that he did not know the length of the railroad platform, but he was "a right smart ways down from the station;" that he did not look to see whether there was a headlight, and could not say whether there was one or not.

Bertha Taylor, colored, testified that she lived at Lime Kiln station, and at the time of the accident was going to Mr. Groves' store for provisions.   She said:

"I was going out where old man Groves is, and I saw the wheel coming down the platform, and I seen this passing train, and I said to myself."

Q.  Tell what you saw?

A.  I saw the rim on the platform coming down.

Q.  The rim of what wheel?

A.  Why, on the platform, the rim that goes round the wheel.

Q.  What wheel are you referring to?

A.  I do not know what wheel.   I guess it was off the wagon.   I was on my way to Mr. Groves', and as I came out of the gate I saw this wheel coming down the platform facing me going to the switch, and then the freight came along, and I was about twelve or fourteen inches from the railroad, going to the switch, and I stepped aside down the bank.   I did not hear any bell or whistle, or see any head-light.   I was going towards the train.   She said she did not see the engine until it was right on her; that she was on the track "and had not got to the platform."

It appears from the testimony of Mr. Plummer a civil engineer, and from the scale of the blue print, made from his measurements of the locality, that Mr. Groves' store is 160 or 170 feet east of the crossing, and that the station platform extends easterly 30 or 40 feet beyond that store.

Albert Speacht, living at Lime Kiln, about twenty-five feet from the station, was in his house stitting by the stove, at the time of the accident, yet did not hear that train at all when it passed.

William M. Parlett testified for the defendant that he had been continuously in its service for 25 years and running an engine for 21 years; that on the evening in question he was running freight No. 94, known as the fast freight from Brunswick to Baltimore; that the train was composed of the engine and twenty-seven freight cars and a caboose; that the head light of the engine was lit when they left Brunswick, when they passed Lime Kiln station, and when they stopped at Riehl's Mill, and received the message that a man had been killed at

Lime Kiln; that the train was going about 35 miles an hour when it passed Lime Kiln.  He said, "When passing Lime Kiln, and before reaching it, I was on the lookout as engineman of that train, and my *engine* did not hit anything at Lime Kiln.  I know this, because there was no mark or trace of anything about the engine, and nothing seen on the track as I passed there.  If there had been anything on the track I would have seen it, and if I had struck anything at that crossing I would have known it, because if you strike anything at all, you see it, and you feel a jar of some kind.  If my engine going at the rate of 35 miles an hour, had struck a buggy and horse, it would throw them a good distance.  It would knock them away from the track, fifteen to twenty yards, probably more.  I blew the whistle for Lime Kiln station at the whistle post from 300 to 500 yards from the crossing.  *  *  *  At Riehl's Mill, where we heard of the accident, we all went and examined the engine very closely, and we could not find a mark or trace or nothing about the engine.  The fireman, the flagman and myself did this.  We did find other evidence that my *train* had come in collision with something, and this was on the first and second cars from the rear and the caboose.  The first and second cars from the rear end were scratched all along, just above the trucks of the cars.  These scars were not there before we started.  The caboose was scratched and there was a small hole right near the center of the caboose.  The marks on the two cars and the caboose were on the right side going down.  We made an examination of all the cars on the whole train, and we did not discover on any other part of the train, the tender, locomotive, or any other cars, any evidence whatever of collision.  The usual speed of my train is thirty to thirty-five miles an hour and it is seventeen miles from Brunswick to Riehl's Mill.  I left Brunswick about 6 o'clock."

On cross-examination this witness said: "The head light was a coal oil lamp in good condition.  I saw the reflection of the head light every place we stopped, and all along the road.  *  *  *  A head light will not throw the light over a couple

of feet from the side of the track.    When I went by Lime
Kiln the light only enabled me to see two or three feet from
the track.    The hole in the caboose was on the right hand
side about four or five feet from the ground.    It was a mark
knocked in like something hit it.    We had torches there, but
I just disremember now what kind of a hole it was.    I do not
know whether the hole went clear through or not."

The flagman, Jacob M. Dicus, testified that there were 27
cars in that train, averaging about 36 feet in length; the en-
gine and tender about 72 feet, and the length of the train over
1,000 feet.    He said: "The whistle was blown as we come
along out of the cut about 500 yards west of Lime Kiln.    I
do not remember whether the bell was rung for the crossing,
but I heard the whistle distinctly.    At Lime Kiln crossing I
was riding on the right side of the caboose in the rear of the
train looking out of the window; we have a bunker that we
sleep on, and I was on my knees with my arms projected on
the window sill, looking around as we come round this curve
to see if there was anything hot   *   *   *   and just as we
come to that station, about two or three cars before the end,
I saw some sparks flying; I did not know what it was, and I
just got my head inside, when the knock came on the caboose,
knocking a hole in the side about three fingers wide.    *    *
This occurred right at the crossing.    I got up and went out
on the rear platform and looked, and did not see anything
wrong and I went in and laid down again.    At Riehl's Mill
we stopped and a helping engine brought us a message to ex-
amine our train as it had struck a wagon at Lime Kiln and
the man was not found yet."    This witness corroborated the
engineer in detail as to the examination of the train then
made, and its results, adding this, "another thing I forgot to
tell you, that the car next to the caboose was covered with
flour, and a piece of flour sack was hanging on the side.  *  *
I know the hole in the cab was just made, because I am with
that day after day.    *   *   *   I saw the fire come from un-
der the wheels of the first and second car next to the caboose,
and I jumped in.    I thought it was the brake wrong or some-

thing.   I saw it under the second car from the caboose first, and then the blow came on the caboose right away in an instant almost.   This was right at the crossing."

Buchanan Hyatt, the conductor, who has been so employed on that route twenty-two years, testified that the speed of that train was thirty to thirty-five miles an hour, the fastest freight they had, and that the whistle was sounded for Lime Kiln station that night at the whistling post, but he could not say as to the bell.   They received a message at Riehl's Mill to examine the train, and especially the engine, as a horse and wagon had been struck and a man killed at Lime Kiln.   He confirmed in every particular the evidence of the engineer and flagman as to the results of this examination, saying, "The first mark was on the second car from the caboose like a shaft or something would scrape along the car.   The first car from the caboose was marked deeper than the second car, and on the nuts were bits of bagging hanging there.   *   *   * I was in the caboose when we passed Lime Kiln and heard a knock on the right hand side of the caboose near about the crossing."   On cross-examination he testified that the engine was eased up at the cut, and was shut off entirely at the crossing.

Raymond McClellan, the fireman, confirmed in all respects the evidence of the rest of the train crew.   In addition he said, "I was ringing the bell going through Lime Kiln.   I was ringing the bell as we passed the crossing, and I saw the head-light was on at that point.   I was looking ahead and I did not see anything, and I did not hear the train strike anything."

Luther U. Feaga, a trackman, of the B. & O. R. R. was in the ticket office at Lime Kiln when this train passed at the time of the accident.   He testified as follows: "After the train went past, a stone came in the window and there was a racket, and as soon as the train passed I went out the door and found this man lying there.   Probably one half the train had passed before there was any racket at all.   *   *   *   The stone came in the window after the engine had gone by, and

afterwards the noise started up." He then described the situation as follows: "I saw the man lying there and the wagon run up against the target pole, with the left wheels broken and the left shaft good. The two right wheels were good. Mr. Black had a scar on the back of his head and his lip cut a little  *  *  *  I went out directly after the caboose went past.  *  *  *  All but his feet were on the platform, and they were on the edge of the road. His head was about fifteen inches from the edge of the platform, and the edge of the platform about two and a half feet from the nearest rail. Flour was lying on the platform and scattered all about." This witness is confirmed as to the condition of the wagon by the photographs produced at the argument and used in the trial below.

Victor Cook and John W. Fisher, both trackmen, were in the ticket office at the time with Feaga and gave the same general account given by him.

The former was acting as agent and was putting the office money into a bag when the stone came through the window. The engine had then gone past the window, how far he could not say. The stone looked like a piece of ballast. The next thing was "a fog rolled by the window which we found afterwards was flour.  *  *  *  I saw flour on the platform and also on the horse when I saw him later."

Fisher testified, "Sometime after the first part of the train passed by we heard a noise and flour sifted up against the side of the building. I could not say then what it was."

Frederick J. Gardner, another trackman testified that he was at the time on the north bound track about 200 feet from the crossing; that while there this train passed, and he heard some noise, and very soon after that the caboose passed him, and he heard Feaga call out that a man was killed. On cross-examination he said when he heard the crash the caboose was near the crossing. He denied that he had said at the inquest that he had heard no crash or noise when the train was passing the station, and Mr. Grove, in rebuttal testified that he had so sworn at the inquest.

Having now summarized all the material evidence, the various exceptions to the evidence will be first considered.

The 1st, 2nd, 3rd, 5th, 7th, 11th, 12th, 13th, 14th, 15th, 16th, 17th, 19th, 20th, 21st and 22nd exceptions are all urged in this Court solely upon the ground that the questions objected to were leading questions, but it does not appear from the record that this ground of objection was made in the trial Court, no specific ground of objection being there made. We think the objection to a question *as leading* should be made at the time it is put, and before it is answered. Mr. Poe so states the rule in *Poe's Practice*, sec. 261, and says, "The reason is that if such an objection had been made at the time the question was put, it could and probably would have been obviated, and it would not be fair therefore to spring such objections afterwards. This is especially the rule in cases where testimony is taken under a commission." To sustain this text he cites *Smith* v. *Cooke*, 31 Md. 174; *Jones* v. *Jones*, 36 Md. 447; *Kerby* v. *Kerby*, 57 Md. 361 and *Brown* v. *Hardcastle*, 63 Md. 495. *Smith* v. *Cooke* was a case where the depositions were taken under a commission, and *Kerby* v. *Kerby* and *Brown* v. *Hardcastle* were equity cases, where the rule is established. *Jones* v. *Jones* was a case in the Orphans' Court where the testimony was taken before lay Judges. We have not found a case where the testimony was taken orally at *nisi prius*, in which this question has arisen, but we perceive no reason why the rule should not be the same in such cases, and Mr. Poe plainly lends his authority to this view in the citation above. These exceptions therefore are not tenable on that ground. In the recent case of *Walker and Baldwin* v. *Frick*, 106 Md. 619, relied on by this appellant the objection was duly made in the lower Court, and the question objected to was a gross violation of the rule, as conveying, instead of asking, information, and directly pointing to the desired answers. Most of these questions objected to as leading in this case, relate to the blowing of the whistle, the ringing of the bell, and the presence or absence of a head light on the engine, and are of a character in which the trial Judge must have a

large discretionary power to relax the rule when its strict enforcement would tend to exclude the truth. These questions were put to witnesses who were in a position to see and hear, and it would have been difficult to put the questions in any other way to elicit an answer. The following will fairly illustrate this whole class of questions."

"Mr. Grove did you hear the whistle blow on that approaching train that night?" ·

"Did you hear the bell ring that night on that approaching train?"

"Did you see a head light on this engine?"

"State whether or not the engine had a head light on it?"

In *McKeown* v. *Harvey*, 40 Mich. 226, the Supreme Court of Michigan, JUDGES CAMPBELL, COOLEY, MARSTON and GRAVES, said, "A question to be answered yes or no is not necessarily objectionable as leading, especially if it could not well have been asked in any other way that would not have been open to the same criticism. · * * * Some discretion must be used on this subject, and over nicety is not conducive to convenience or justice." See also 8 *Enc. Pl. & Pr.* 80; 3 *Jones on Evidence*, 815; *Chamberlayne's Best on Evidence*, sec. 641.

There was grave error, however, in another respect in the ruling on the seventh and eighth exceptions, which are among those excepted to as leading. Wm. J. Grove, being on the stand, after testifying generally as to how far the sound of an approaching train could be heard by one at this crossing, and as to the effect of different atmospheric conditions, said that when he heard the crash, the sound came from the direction of the crossing. He was then asked, "Could you tell from the sound where the *engine* was at the time of the crash?" and the witness was allowed to answer over the defendant's objection, his answer being "yes." The next question was, "Where was it?" and the answer was "at the crossing." The purpose of these questions obviously was to sustain the allegation of the *nar* that the *engine* was driven over the wagon of the deceased, and rebut the defence that the *only collision* was with the three rear cars. This is the vital point in the case,

upon which mere conjecture or opinion would be most injurious, and could not be allowed.   When it is remembered that Mr. Grove was then in his office 180 feet from the crossing, with closed windows, on a damp foggy night, which he testified seriously obstructed the transmission of the sound made by trains passing that station, it is perfectly plain that he could not testify from *any knowledge* as to where the *engine* was at the moment of the crash, and his answer represented either *mere conjecture*, or at most his *opinion*, neither of which can be admissible.   This subject has been so recently and pointedly reviewed in this Court that no reference to authorities is required.   This error alone would require a reversal.

We come now to the second class of exceptions embracing the 4th, 6th, 23rd, 24th, 25th, 26th and 27th exceptions. The 4th and 6th relate to the distance at which a man in a wagon close to the track at the station, could see an approaching train from the west, and how the dampness of the atmosphere would affect the sound of the train, and we discover no error in these rulings.

The 23rd and 24th exceptions were taken to questions put to two witnesses, asking "what were Mr. Black's habits with reference to being a careful and cautious driver or otherwise?" In *American Straw Board Co.* v. *Smith*, 94 Md. 19, the action was to recover damages for an injury alleged to have been caused by the negligence of the driver of defendant's wagon, and it was held that evidence that the driver was competent generally in that capacity, was not admissible, because, as JUDGE FOWLER said, "The issue was did the defendant's servant drive properly and with care on this particular occasion, and not whether he possessed competency and skill sufficient to have done so, if he had chosen to exercise his skill." We cannot distinguish that case from the present in the application of the principle there decided.   This question has been carefully considered by the Supreme Judicial Court of Maine and the conclusion reached sustains the view expressed in 94 Md. *supra*.

In *Chase* v. *Maine Central R. R. Co.*, 77 Maine, 62, it was

held that in an action for personal injuries received by a collision at a railroad crossing, evidence will not be received to show the general habits and character of the traveller for carefulness, as bearing upon the question of due care on his part, though the injuries occasioned death before he could tell how the accident happened, and no one saw him at the time of the collision.

CHIEF JUSTICE PETERS said: "The intestate's sleigh collided with a train at a railroad crossing. He thereby received an injury and very soon afterwards died. He never was conscious enough after the injury to tell how the accident happened. No one was with him at the time. No one saw him at the moment of collision. As evidence that he could not have been guilty of any negligence which contributed to the accident, witnesses who had been his neighbors for sometime were permitted to testify to their opinion of his general character for carefulness. We think this was overstepping the limit allowed to collateral evidence. We dare not abide by it. Our belief is that such a rule would be fraught with much more evil than good. The best authorities clearly sustain the doctrine that the fact of a person having once, or many times, in his life done a particular act in a particular way, does not prove that he has done the same thing in the same way, upon another and different occasion. * * * If a man who is customarily careful were always so, there would be reason for admitting the evidence. But the issue is whether the intestate was careful in this particular instance—a fact to be, either directly or circumstantially, *affirmatively proved.* * * * The law imperatively demands that a traveller look and listen before crossing if there is any opportunity to do so. What did these farmers know about the intestate's habitual care in that respect? It is not a ground for the admission of this evidence that the plaintiff can produce no other. It is neither of primary nor secondary importance—it is not evidence at all."

Adopting this reasoning, and following our own previous decision in 94 Md., we must hold there was error in the ruling on the 23rd and 24th exceptions.

The 25th exception relates to an inquiry whether the deceased was a prudent and economical man, wasteful or careful of his means: This inquiry was relevant and material to the proof of pecuniary loss sustained by the premature death of the husband and father and there was no error in this ruling.

Reference has already been made to the fact that when Cook and Feaga were in the ticket office when this train passed, a stone came through the window. While Cook was under cross-examination, plaintiff's counsel asked him these two questions. Q. "You heard the stone come through the window; and the engine was passing down the track and the train was passing?

A. Yes sir.

Q. And yet you did not hear the engine or any part of the front or the front of the train strike it?

A. No sir, it did not. It would be impossible because the engine had passed."

Thereupon the Court, *on its own motion,* directed that the words, "It would have been impossible because the engine had passed," be struck out of the last answer, leaving the answer to stand. "No sir—It did not." The defendant objected to the striking out of these words, and the Court overruled the motion and struck out those words, to which action of the Court the 26th exception was taken. It is observable here that the words stricken out are part of an answer to a question on cross-examination, and that the objection to striking them out, comes not from the cross examiner, but from the counsel of the adverse party. Neither counsel objected to the answer. It is generally held that a Judge presiding at a trial is not a mere moderator between the parties, but has active duties to perform without partiality in seeing that the truth is developed. Hence it is his privilege, and may be his duty, to examine a witness, or to recall him to supply an omission of proof necessary to justice in the result of the trial. 21 *Enc. Pl. & Pr.*, 990. The general rule undoubtedly requires an objection to improper evidence, and it is a settled rule that

evidence once admitted without objection in the trial Court, cannot be disregarded in an appellate Court. But the power of the Court, in civil causes, to strike out testimony on its own motion does not appear to be definitely settled, nor to have been much considered. Mr. Wigmore in his work on Evidence, vol. 1, sec. 18, says, "The initiative in excluding improper evidence is left entirely to the opponent, so far at least as concerns his right to appeal on that ground to another tribunal. The Judge may of his own motion deal with offered evidence, but for all subsequent purposes it must appear that the opponent invoked some rule of evidence." This rule does not appear to be in complete harmony with other writers as applied to all cases, criminal as well as civil. It is stated, correctly as we think, in 21 *Enc. Pl. & Pr.*, 992, that if improper evidence is offered, or elicited, by the State in a criminal case, the Court should exclude it, whether proper objections on behalf of the defendant are made or not; and the author of that article adds that it has been held even in a civil proceeding, when the irrelevancy or incompetency of the evidence are at once apparent, there is no good reason for the application of the rule requiring specific objections to the testimony, and in *State* v. *O'Conner*, 65 Mo. 324, this was said to be the correct view.

Appellate Courts will not interpose to control any discretionary power of a trial Court unless the discretion has been abused or plainly exercised unwisely. In the present case while we cannot perceive any *necessity* for the action of the Court in striking out the words mentioned, neither can we discover that any substantial injury was thereby worked to the defendant. The real meaning of the answer is the same, without, as with the words stricken out, and we need only say that the instances in which this power should be exerted in civil cases must be very rare, and that it should be exercised with the utmost care and caution.

The twenty-seventh exception was taken to the allowance of a question put to Wm. J. Grove who was called in rebuttal by the plaintiff for the purpose of impeaching F. J. Gardner, a

witness produced and sworn by the plaintiff.   He was subse-
quently called and testified on behalf of the defendant, and
upon his cross-examination at that time, there testified that he
had not sworn at the inquest that he had not heard any noise
while the train was passing.   Mr. Grove in rebuttal, said he
was present at the inquest, and that Gardner did swear
that he had not heard any noise.   The appellee in his brief
states that this evidence was offered *for the purpose of impeach-
ing the credibility of Gardner*, and this being the purpose and
necessary effect, there was error in its admission.   *B. & O. R.*
*R.* v. *Woodward*, 41 Md. 295.   In that case the Court ex-
pressly said: "It was not competent for the plaintiff *at any
stage of the trial, or of his examination*, to impeach the credi-
bility of this (his) witness."   He had there been called, as
here, *in the first instance* for the plaintiff.   In the case before
us, the appellee's counsel apparently regards the fact that
Gardner was subsequently called by the defendant, and that
upon his cross-examination a foundation for impeachment was
laid, as taking this case out of the rule.   But such is not the
law.   By offering the witness, the plaintiff represented him as
worthy of belief, and he cannot afterwards offer any evidence
*for the purpose of discrediting him*.   He may contradict him
by another witness as to any fact material to the issue, to
which he has deposed, in order to show how the fact really
was.   *Franklin Bank* v. *Steam Navigation Co.*, 11 G. & J. 36.
Or "where a witness has made to a party, or his attorney who
calls him a statement totally variant from his sworn testimony,
and on the faith of such statement he has been called, he may
be asked if he made such statement, and if he denies it, there
is no objection to the proof of such statement, not for the pur-
pose of impeaching his general character as a witness   *   *
but because the principles of justice require that the plaintiff
should be allowed to show why he called him.   But the pres-
ent case does not fall within either of these exceptions.   In
*Becker* v. *Koch*, 104 N. Y. 401, a leading case upon this sub-
ject, it is said that the result of an examination of the rule will
be found to be that proof of contradictory statements cannot be

made except in the circumstances stated above and this is the
result also of the views expressed by Mr. Greenleaf in section
444 of his first volume on Evidence.    We now come at last to
the prayers.

The plaintiff's first prayer, which was granted, is as fol-
lows:    "The plaintiffs pray the Court to instruct the jury,
that if the jury find that on or about the 19th of December,
1906, Henry S. Black, the husband of the equitable plaintiff,
Laura C. Black, and the father of the equitable plaintiffs,
Mamie, Charles and Robert Black, if the jury shall find such
relationships, was killed by an engine and train of cars of the
defendant whilst operated by its agents and servants, and that
said killing resulted directly from the want of ordinary care
and prudence on the part of the agents and servants of the de-
fendant, and not from the want of ordinary care and pru-
dence on the part of the said Henry S. Black directly thereto
contributing, then the equitable plaintiffs are entitled to re-
cover."

The plaintiff's second prayer, also granted, merely placed
upon the defendant the burden of proving contributory negli-
gence on the part of the plaintiff.

The plaintiff's third prayer, also granted, permitted the
jury to take into consideration the known and ordinary dis-
position of men to guard themselves against danger, and the
fourth and fifth prayers of the plaintiff, also granted, laid
down the established rule as to the measure of damages in
event of recovery, and the apportionment thereof amongst the
several equitable plaintiffs according to the discretion of the
jury.

If this case was properly sent to the jury there was no
error in granting any of the plaintiff's prayers.

The defendant's eight prayers are all demurrers to the evi-
dence, and were all rejected.    The first, second and fifth de-
mur generally to the evidence as legally sufficient to sustain
a verdict for the plaintiff.    The sixth, seventh and eighth
challenge the legal sufficiency of the evidence under the
pleadings in the cause, by direct averment; and the third and

fourth, though not in express terms referring to the plead-
ings, deny the right to recover without proof that the plaintiff
was killed by the *engine* of the train, and assert that there is
no legally sufficient evidence of that fact.

The defendant also specially excepted to the granting of
the plaintiff's first prayer, on the ground of failure of evidence
to support its hypothesis of facts, either generally or under
the pleadings in the cause.

In *B. & O. R. R.* v. *State use of Savington,* 71 Md. 599,
this Court, citing *Parrott* v. *Wells, Fargo & Co.* 15 Wall. 537,
said: "No one is responsible for injuries resulting from un-
avoidable accident whilst engaged in a lawful business. A party
charging negligence as a ground action *must prove it.* He
must show that the defendant by his act, or by his omission,
has violated some duty incumbent upon him, *which has caused
the injury complained of.* And in *Benedick* v. *Potts,* 88 Md.
54, it was said, "To entitle a plaintiff to recover in an action
of this kind, he must show not only that he has sustained an
injury but that the defendant has been guilty of some negli-
gence *which produced that particular injury.* The negligence
alleged and the injury sued for, must bear the relation of cause
and effect. The concurrence of both and the *nexus* between
them must exist to constitute a cause of action." These are
fundamental propositions, as firmly established in the law as
they are supported by reason and justice. Nor is there any
uncertainty or vagueness as to the character or quality of
the evidence by which the plaintiff must prove the negligence
of the defendant, and the resultant injury sued for. In the
case cited from 71 Md. *supra,* the law is thus stated: "In
matters of proof we are not justified in inferring from mere
possibilities the existence of facts; there must be proof of the
essential facts to fix liability upon a party charged with the
commission of a wrongful act. An even a *scintilla* of evidence,
or a mere surmise that there may have been negligence on
the part of the defendant, will not justify the Court in sub-
mitting the case to the jury. There must be, in a case like
the present, some reasonable evidence of well defined acts of

negligence, as the cause of the injury complained of; and therefore it is incumbent upon the plaintiff to give some affirmative evidence of the existence of such negligence before he can ask that the case be submitted to the jury.   *   *   * Juries cannot be allowed, however great the deference conceded to their province, to make mere conjecture or speculation the foundation of their verdicts.   If there be no evidence upon which a rational conclusion may be based in support of the claim of the plaintiff, the case should be withdrawn from the jury, and to do this is a preliminary duty of the Court."

It is alleged that the defendant was negligent, first in the running an overdue freight train at high speed over a crossing; and second in failing to have the head light burning, and in failing to ring the bell and blow the whistle for the crossing.

As to the first charge, it is notorious that trains upon the best managed railroads are often behind time, especially freight trains which are subordinated to passenger trains by reason of the public demand for frequent and rapid passenger service.   "It is beyond the highest skill to guard against and prevent such delays.   *   *   * Judges cannot denude themselves of the knowledge of the incidents of railway travelling which is common to us all."   *Balt. & Yorktown Turnpike Co. v. Cason*, 72 Md. 381.   It is just such contingencies, the lateness of scheduled trains, and the presence of unscheduled trains, which *most* imperatively demand the enforcement of the rule that a traveller at a crossing should stop, look and listen.   This train was travelling at a schedule rate but was somewhat behind time.   In no aspect of this question, can negligence be imputed to the defendant on this ground.

As to the second ground for charging negligence, the question is a close one.   There is abundant and positive evidence from the trainmen that the head light was burning at Lime Kiln, and that both signals were given for that crossing. Several witnesses, who should have seen and heard, testify that they did not see the head light, nor hear the bell or whistle, and one witness, Rice, who was watching the train when it passed Buckeystown before it reached Lime Kiln, testified that he did not see any head light.

Bertha Taylor who said she saw the train approaching until it was within a foot or two of her, swore positively there was no head light burning.    The uncontradicted testimony is that the head light was burning when the train left Brunswick, and when it reached Riehl's Mill, and it is therefore a strain upon our credulity to believe that it was not burning when the train passed the intermediate point at Lime Kiln.    But Bertha Taylor's testimony constituted affirmative evidence that it was not then burning, and whether she was truthful or mistaken was a question for the jury.    We cannot withdraw cases from the jury *upon a question* as to which there is any affirmative evidence on the part of the plaintiff, merely because we may apprehend undue credence may be given to such testimony.

But we are clearly of opinion that even if the head light was not burning, and if neither the whistle nor bell was sounded for this crossing that there is no evidence that any of these omissions was the cause of the death of Henry S. Black.

The engineer testified that he was on the lookout in his cab on the right hand side of the engine; that he saw the reflection of the head light at every point along the road and saw nothing on the track; that he knows his engine did not strike anything at Lime Kiln because he would have seen it and would have heard and felt the jar, and the fireman testified positively to the same effect.    Could it be possible, if the engine had collided with the carriage, that neither the engineer nor fireman in the cab heard the crash, which was heard not only by the three men in the closed station house, but also by Mr. Grove in his closed office 150 to 175 feet distant?    If the engine had collided with the carriage, could it be possible that neither the engine, the pilot, the tender, nor any of the forward cars bore any mark or trace of the collision?    Could it be possible that the flour in Mr. Black's wagon, so profusely scattered over his body, the carriage, the horse, and the three last cars of the train, should not have been found upon the pilot, the engine or the cab, instead of on the caboose and the two next cars?    If the engine had come squarely in collision with the carriage while on the crossing' the horse

being uninjured, could the carriage have been left in the condition it was, with the left wheels crushed, and the right wheels uninjured, the carriage itself hung upon the target pole at the side of the track?   Would it not necessarily have been broken into fragments, and those fragments scattered in every direction by the impact?   Could the body of the unfortunate man have occupied the position it did on the platform, and the wounds have been such only as it bore, if he had been struck by the engine?   There can be but one answer to these questions, and that answer is that these things could not have been.   The *nar* charges that the *engine* was negligently forced and driven upon and over the deceased, and having chosen so to charge, the proof must conform to the charge, and it might well be claimed that there could be no recovery in this *case for that reason.*   But we are not required to rest our decision upon that ground, and prefer not to do so.

The physical facts in the case demonstrate that there was no collision of the engine with the carriage, and that the alleged negligence of the defendant, if established to the satisfaction of the jury, was not the cause of the accident.

This case in some respects closely resembles that of *N. C. R. W.* v. *Burns*, 54 Md. 112.   In that case the only particulars in which negligence was imputed to the company were, first a failure to keep a reasonable "look out" on the train; and second a failure to give reasonable signals of its approach by ringing the bell or sounding the whistle.   The engineer and fireman in that case testified that they were both keeping a vigilant "look out," and that neither of them saw Mrs. Burns. The accident happened about 8 A. M. and it was argued they must have seen her, and therefore their testimony might be disregarded by the jury.   But the Court, speaking through CHIEF JUSTICE BARTOL, said, "this suggestion might be entitled to some weight, if it had been proved that the unfortunate lady was on the track in front of the train and had been struck by the locomotive; for if that had been shown they could not have failed to see her if they had been looking out as they state.   But in this particular, the plaintiff's evidence fails.

*From all that appears, she may have come into contact with some other part of the train, either in attempting to cross or getting too near the track after the locomotive had passed, in which case she would not be seen by the engineer or fireman, but their failure to see her under such circumstances would be no ground for imputing negligence to them. They were under no obligation to look back.* One of the hypotheses stated in the Court's instructions is that Mrs. Burns was not struck by the locomotive, but by some other part of the train. *If that were so, it is clear the defendant would not be responsible for her death."* That which the Court there said *might be so,* we think the proof here shows, clearly, *was so*—and if so, that case is authority for withdrawing the case from the jury, as the Court of Appeals said should have been done in that case.

In this case the positive evidence as to how the accident occurred is greatly aided by the testimony of the two witnesses for the plaintiff Randolph Crampton and Bertha Taylor, who testified as to the rim of the carriage wheel rolling down the platform *in the direction of the moving train,* while it was passing the station. This motion could have been imparted to the broken wheel by a side wipe of the carriage by the train, but could not have been imparted by a collision of the engine with the carriage while on the crossing. This is too obvious to require illustration. Bertha Taylor places herself in a location which raises a serious doubt as to the reliability and credibility of her testimony, but whatever weight is properly to be given to this testimony about the carriage wheel rolling down the platform as testified to, strengthens the evidence of the defendant's witnesses, and the physical evidence that the only collision was when the third car from the rear of the train was passing the crossing. Up to that time the deceased was in a position of safety, while the long train was passing the crossing. As was said in *Roming's case,* 96 Md. 67, "It is almost incredible that a heavy train approaching, with unslackened speed * * * did not make noise enough to be heard by him if he had listenened for it with proper caution." In that situation, neither head light, bell nor whistle could have

been needed.  The sight of the passing train, blocking the crossing, and its sound as it "thundered by" according to the testimony of Mr. Grove, was the most effective warning possible as Black stood at or approached the crossing.

The Court, if it were at liberty to speculate or indulge in surmise, might believe that the deceased attempted to cross before the rear of the long train had passed, or that the horse, standing close to the track became frightened from some cause, and moving forward and swerving away from the direction of the motion of the train brought the carriage into side wise contact with the passing portion of the train, forcing the carriage forward alongside of the train till it reached the platform, thus explaining the crushing of the left wheels while the right remained intact, the location of the carriage upon the target pole and the position of the body upon the platform.  But this would be mere surmise or speculation in which neither Court nor jury may indulge.  As was said in *Benedict* v. *Potts*, 88 Md. 59, "all that is certain is that he was injured in *some* way, and the plaintiffs ask that the jury be allowed, and in the absence of all explanatory evidence, to infer that some act of a negligent character for which the defendant is responsible, caused the injury sustained.  No case has gone to that extent, and no known principle can be cited to sustain such a position."

The record does not in our opinion furnish any legally sufficient evidence of any negligence of the appellant causing or contributing to the collision by which this unfortunate man lost his life, and the defendant's prayer withdrawing the case from the jury should have been granted.

> *Judgment reversed with costs without awarding a new trial.*

Upon petition for modification of judgment of reversal,

Pearce, J., delivered the opinion of the Court.

After the opinion reversing the judgment in this case had been filed, without awarding a new trial, a motion for a re-argument was filed by the appellees.  This motion was urged

upon the ground, as assumed by the appellees, that the Court had inadvertently overlooked testimony, which it was earnestly contended was sufficient to take the case to the jury, and that the judgment therefore should have been affirmed. We carefully reviewed the whole case in considering that motion, and pointed out in the opinion then filed that we had not overlooked, as was supposed, the testimony relied upon in that motion, and that our view of its force and effect remained unchanged, and the motion for re-argument was accordingly overruled.

Subsequently, on May 19th, 1908, the appellee filed a petition for a modification of the judgment, by reversing and remanding the case for a new trial. This petition is founded solely upon alleged newly discovered evidence, by means of which the appellees claim they "will be able to supplement the evidence shown by the record, by additional proof showing that the collision from which the death of Henry S. Black resulted was caused by the contact of the engine of the appellant with the wagon of the decedent." This petition is accompanied by the affidavit of Edwin W. Lewis, who deposes that he witnessed the accident, and that the engine of the appellant collided with the wagon of the deceased. This petition is also accompanied by the affidavits of Messrs. Urner and Stoner, counsel for the appellees, that the facts deposed to by said Lewis were unknown to them, or to the appellees before May 16th, 1908, and could not have been discovered by them, or any of them, by the exercise of any diligence on their part, and we unhesitatingly accept this as strictly true. There is also filed with said petition an affidavit of Charles Fisher, head machinist Ox Fibre Brush Company of Frederick City, to the effect that said Lewis is a reputable and credible person. Assuming this to be so, it is to be observed that Lewis, in his affidavit, does not state that he did not know of the pending suit and trial resulting from this accident, and that he gives no excuse or reason for his failure to communicate to Mrs. Black or to her counsel his alleged knowledge of the circumstances of this accident, though the suit was brought and the trial

had, in the city of Frederick, where he resided.    It is also to be noted that though Lewis, according to his affidavit, must have been in a position to know whether the whistle was sounded for the crossing and whether the head light of the engine was burning and the bell was ringing as the engine reached the crossing, he is silent upon this vital question; vital because if the whistle was sounded, and the head light was burning and the bell was ringing, as the engineer and fireman testified, there was absolutely no evidence of negligence on the part of the defendant.    Mr. Stoner, in his affidavit, says that he heard Lewis state to Mr. Urner "that if he, Lewis, had known that said Urner was connected with the case, he would not have told him of his knowledge with reference to said accident."    His failure to communicate his knowledge to Mrs. Black, or to her counsel, before the trial, and his subsequent statement to Mr. Urner that he would have continued to conceal it if he had known of his connection with the case, does not present him to the Court in a favorable light.    It is true he was under no legal obligation to volunteer his evidence, but his concealment of his alleged knowledge, in a case of that character, evinces a regrettable indifference to a clear moral obligation.

If this affidavit had been seasonably presented to the trial Court, that Court would have dealt with the question of a new trial, in the exercise of its conceded discretion.    But that is not the situation here.    The question squarely presented, is, whether newly discovered evidence can be availed of, as ground for a new trial, under any circumstances in this Court, as a Court of appellate jurisdiction only, and upon this question there can be no doubt as to the law in this State.    In *McCann* v. *Sloan*, 26 Md. 81, the point came up directly. Sec. 16 of Art. 5 of the Code of 1860, provided that "in all cases where judgments shall be reversed or affirmed by the Court of Appeals, and it shall appear to the Court that a new trial ought to be had, a writ of *procedendo* shall issue;" and that writ was applied for on the ground of newly discovered evidence.    The Court said, "It is obvious from the language

of this section, *as well as the final character of decisions in this Court, that the propriety of a new trial must appear from the record before the Court* at the time of the *reversal or affirmance of the case under consideration.* Any other construction would convert this Court into a tribunal of original, instead of appellate jurisdiction. When this case was under consideration the question of *procedendo* was presented to the minds of the Court, and the conclusion reached that there was no ground for the writ. The appellants now seek to change the decision of the Court, by presenting an affidavit of a witness to supply a defect of evidence in the record, on the ground that it is new evidence discovered since the trial of the case. This is virtually a motion for a new trial, for reasons not appearing in the record. * * * If the Court had the power, it would be a precedent of dangerous tendency to award a *procedendo* under such circumstances. *Without regard to these, the motion is overruled, because the record* does not show that a new trial ought to be granted.''

In *Archer* v. *State,* 74 Md. 410, there was a motion, after affirmance of the judgment on appeal, to remand the cause for a new trial, the motion being founded on section 20 of Art. 5 of the Code of 1888, which was in the same language as sec. 16 of Art. 5 of the Code of 1860, except that it substituted the words, "such new trial shall be awarded," for the words, "a writ of *procedendo* shall issue."

In that case the Court overruled the motion and quoted from *McCann* v. *Sloan, supra,* as showing "how firmly this Court has adhered to the rule of confining its attention to the record." The Court added, "Our functions are confined to a review of the questions of law decided by the Court below. * * * We must pause and consider carefully the grounds of this motion before we give our assent to it. We may well inquire into the rights of the defendant in this behalf; and we well ask whether the just limit of litigation has not been reached. * * *. We can make due allowance for the earnestness of counsel in behalf of their clients, and for the depths of their convictions produced by the warmth of their

zeal. But it is our part to decide questions before us, without any of the excitement which naturally belongs to the efficient discharge of the duties of the advocate. * * * No principle or rule of practice will authorize another trial of these issues. If we should decide otherwise, we should destroy confidence in the conclusiveness of judgments, and greatly multiply the evils of litigation by introducing into the administration of justice uncertainties and embarrassments which never existed before."

In a "supplemental petition" handed in without filing, on May 30th, 1908, but which will be ordered filed, the appellees state that "the preceding petition was not intended to be predicated upon the theory that a new trial ought to be awarded merely because of newly discovered evidence, but upon the theory that the record before the Court at the time of the judgment was not devoid of evidence tending to support the plaintiff's theory," and that they feel justified therefore in urging the justice of awarding a new trial in this case because of the testimony already in, and not because of newly discovered evidence." This however is plainly an effort to eke out the record by something *dehors* the record, and is in palpable conflict with the reasoning and conclusions of the two cases cited. This application must either be regarded as a mere motion for a new trial upon the ground of newly discovered evidence, and for that reason not allowable, or it must be regarded as a renewal of the motion for re-argument based upon the record as presented to the Court when its judgment was rendered. In that light it has already received our best consideration, and we can perceive no reason why we should now change our views.

For these reasons the petition must be refused.

*Petition refused.*

*Decided June 25th, 1908.*