STATE, use of Silver, vs. P., B. & W. R. R. Co.  65

Md.]                    Syllabus.

:

STATE OF MARYLAND, Use of Sarah Silver et al.,
    vs.  THE  PHILADELPHIA,  BALTIMORE
        AND WASHINGTON RAILROAD
                COMPANY.

*Negligence: contributory—; burden of proof shifted.  Railroad
tracks: themselves a warning.  Evidence: mere con-
jecture and speculation not allowed.  Fail-
ure to examine a witness; no
legal presumption.*

Railroad tracks are themselves some warning of danger.    p. 68

When a person is injured while negligently trying to cross
    before an approaching train, the burden of proof is upon the
    plaintiff to show that the agents of the company were guilty
    of negligence in not avoiding the accident, notwithstanding
    the negligence of the party injured.                    p. 69

The failure of a party to a suit to examine a certain witness
    should raise no legal presumption against him.       pp. 69-70

Railroad companies are not held so strictly to their duty to pro-
    tect persons crossing railroad tracks in the open country as
    they are in the city.                                   p. 76

The failure of the engineer of a train to give any signal as he
    approaches a crossing can not be given in evidence of negli-
    gence, where there is no evidence that such failure was in any
    way connected with the injury complained of.           p. 77

A case should not be allowed to go to the jury when there is
   nothing but mere conjecture and speculation as to how the
   injury complained of occurred.                    p. 77

*Decided February 18th, 1913.*

Appeal from the Court of Common Pleas of Baltimore
City (DUFFY, J.).

Isaac Silver having been killed at Odenton while driving
across the tracks in front of an approaching express train,
suit for damages was brought against the railroad company to
the use of his wife and children. A judgment having been
rendered on a verdict found in favor of the defendant, this
appeal was taken.

The cause was argued before BOYD, C. J., BRISCOE,
BURKE, THOMAS, PATTISON, URNER, STOCKBRIDGE and CON-
STABLE, JJ.

*W. Harry Holmes* and *Alfred S. Niles* (with whom were
*Niles & Wolff* on the brief), for the appellant.

*Charles H. Carter,* for the appellees.

BOYD, C. J., delivered the opinion of the Court.

This is an appeal from a judgment in favor of the defend-
ant (appellee) on a verdict returned by a jury in accordance
with two prayers granted by the Court at the conclusion of
the testimony offered by the equitable plaintiffs, instructing
the jury to render a verdict for the defendant. Isaac Silver,
the husband of Sarah Silver, and the father of the other
equitable plaintiffs, was killed on October 30th, 1910, at a
grade crossing of a county road over the tracks of the rail-
road company. Mr. Silver was a successful merchant at

Odenton, Md. He lived about half a mile from the crossing, which is a little less than half a mile south of Odenton—his home being on the westerly side of the railroad, and there being two tracks at the crossing, the one on which trains go from Washington towards Baltimore being known as the northbound track, and the other, on which trains go towards Washington, being spoken of as the southbound track. This unfortunate accident was caused by a collision of a train on the southbound track with a buggy in which Mr. Silver was riding. The train consisted of a combination car, two passenger coaches, a pullman car, and the engine and tender, and was running about fifty miles an hour. There is a slight up-grade from Odenton in going south for some distance—a surveyor who made a plat offered in evidence says the track rises slightly to a point about half way between Odenton and the crossing and then drops about thirty or forty feet to the mile, and the engineman, who was called by the plaintiffs, said, "the track is up-grade from Odenton, until you get a little below the crossing, may be 100 or 200 feet." Just what he meant by "below the crossing" is not clear, but he said he was running at about the same speed at the crossing as he was at Odenton, which he testified was 45 or 50 miles an hour. The county road crosses the railroad from the westerly side at an angle of about twenty-eight degrees,—running in a southeasterly direction. Mr. Silver was going from his home at about two o'clock one Sunday afternoon when the accident occurred; the weather was clear and the tracks were described by the witnesses as being in the usual condition.

. There was a whistling post for the southbound track 823 feet north of the crossing, and there was evidence that the whistle was not blown and that no danger signals were given. None of the witnesses saw the accident, unless it was the engineman, and he was only examined as to the size and equipment of his train, the speed and the grade. At the argument it was conceded by counsel for the railroad company that there was some evidence of negligence on its part,

by reason of the testimony that no whistle was blown or danger signals given, and while counsel for the plaintiffs did not in terms concede that there was contributory negligence on the part of the deceased, they relied on what is sometimes called "Negligence in the Third Degree," and contended that there was sufficient evidence to go to the jury on the question whether the company's agents could by the exercise of reasonable diligence have avoided the consequences of Mr. Silver's negligence in going upon the tracks.

It can not be doubted that there was evidence of contributory negligence by him in going upon the track when a train was thus approaching. As has often been said by this and other Courts, railroad tracks are themselves some warning of danger, and the photographs in evidence show that there were signs on each side of the crossing reading, "Railroad Crossing. Stop, Look and Listen." Mr. Silver lived within half a mile of the crossing, and he was engaged in business at Odenton, a small village through which the trains of the defendant run. He must therefore have been familiar with trains running on that road between Baltimore and Washington. A train running at fifty miles an hour would necessarily make much noise, which at a quiet country crossing could be heard at a very considerable distance, if there was no other train or other noise in the neighborhood, and there is no evidence that there was either. It is true there was a small cut or embankment six or seven feet high a little distance north of the crossing, but the acting coroner testified that the weeds and grass had been cut off in the latter part of September or early in October, and the evidence showed that while the tracks in the cut could not be seen from the crossing a train could be. One witness who made experiments said that from a point about twenty-six feet west of the crossing he could see a train about fourteen hundred feet towards Odenton and several witnesses said that when on the crossing the tracks could be seen for at least eight hundred feet. There is nothing to show that Mr. Silver was not in full possession of his senses of sight and hearing,

although there was some evidence tending to show that the curtains on his buggy were down. His horse was gentle. The photographs offered by the plaintiffs, together with the other evidence, make it difficult to understand why any one would have attempted to cross the tracks when he knew or could easily have known by the use of his senses that a train was approaching, and in the absence of eye witnesses or other explanation it would seem that it must have been owing to what has caused so many accidents at grade crossings,—that he assumed he could get over before the train reached him and took the risk of not doing so.

This brings us to the point relied on by the appellants. The difficulty that at once meets us in considering that branch of the case is that there is no evidence in the record which could have enlightened the jury on the subject. If, as we have indicated, the deceased was guilty of contributory negligence in attempting to cross the tracks under such circumstances, the burden was shifted and the plaintiffs were required to show that the defendant's agents were guilty of negligence in not avoiding the accident, notwithstanding the negligence of the deceased. They were forced to rely on a matter of a few seconds, as to whether the engineman running at a speed of forty-five of fifty miles an hour could have sufficiently checked the train so as to avoid the accident from the time he could have seen the deceased on the track or could have known that he was about to go on the crossing, notwithstanding the approach of the train. It can not be claimed that the evidence shows that the engineman did see him in such perilous position in time to have avoided the accident, if he had then used due and reasonable efforts to prevent it, for as we have seen, the record is utterly devoid of any evidence on that subject. The plaintiffs naturally and perhaps wisely refrained from examining the engineman as to that, as they would then have been using the testimony of the man whom they were seeking to show was responsible for the unfortunate death of the deceased. Their failure to examine him on the subject should therefore raise no presumption

70 STATE, use of Silver, vs. P., B. & W. R. R. CO.

Opinion of the Court. [120

against them, but the fact remains that no one testified to seeing the accident and hence no one can say from the record just how it occurred.

It is evident, therefore, that a jury could not have found that the engineman did not do all that was required of him after he discovered the deceased in the perilous position from any direct evidence on the subject, and a verdict finding that he did not would necessarily have been founded on speculation. An engineman has many duties to perform in running rapidly through the country, in addition to looking out for crossings,—especially a crossing such as this. The safety of the passengers in his charge may have demanded the attention of the engineman to some part of his engine for the few seconds which the plaintiffs claim were of such moment; the brakes may not have worked as promptly as they should, or for some good reason he may have been unable to check the train in time after he discovered the deceased. As shown by one of the photographs, there is a curve a short distance north of the crossing (at the embankment spoken of above) and if the engineman was looking in front of his engine he apparently could not have seen that the horse was on the track until he got closer to the crossing than the embankment. If when some distance north of that point he could have seen or did see Mr. Silver approaching the crossing, under the authorities he had the right to assume he would not go on the tracks in a place of danger.

The appellant called J. Frank Snyder, a locomotive engineer of the Western Maryland Railroad Company, as an expert. He said that such a train as that was, under the conditions explained to him, going at forty-five miles an hour, "could be stopped by the use of the Westinghouse E. T. equipment high speed brake in about 450 to 500 feet; that if the train was going at about fifty miles per hour, it could be stopped within from 825 to 850 feet; I couldn't say exactly because I have never seen it tested." The engine in question was equipped with that brake. But a witness (William M. Clarke) who said he saw the train forty-five or fifty

feet below the crossing, or somewhere near that, was asked: "Was there or not any effort made to stop it?" and replied, "You could see that he commenced to cut down. I could tell by the working of the engine that he was stopping." He was then asked, "Where did the train stop?" and answered, "1400 feet below the crossing," and said he measured the distance. If then it took the engineman fourteen hundred feet to stop, Mr. Snyder was either wholly mistaken as to the time within which such a train could be stopped, or there was some trouble about the equipment which prevented it from being stopped as soon as it could ordinarily have been, for surely we can assume that the engineman did stop as soon as he could after striking the buggy, but the appellants proved that it did stop for 1300 or 1350 feet after the witness Clarke saw that he was beginning to stop. Mr. Clarke did not say the engineman was not attempting to stop before he reached the crossing. He was about one thousand feet on the east side of the crossing, and his view of the train was cut off by some trees and bushes and hence he could only testify as to what he saw after the train came within his view, which was after it passed the crossing.

Owing to an entire absence of testimony on the subject, it would have been impossible for the jury to have determined when Mr. Silver drove upon the tracks, or at what speed he was going. It may be easy to calculate how long it will take a horse and buggy to cross over a railroad track, if the speed at which the horse was moving is known, but whether Mr. Silver's horse was then going in an ordinary walk, or a trot, or was being hurriedly driven over the crossing at an unusual speed it is impossible to say. It is not an unusual sight to those accustomed to being near railroad crossings to see vehicles rapidly driven over them just in front of approaching trains, and the law books furnish many instances when such attempts have been disastrous. This buggy was struck on the first track, and while it may be that if Mr. Silver had had two or three more seconds he would have crossed in safety, no one can say from the record whether it would have

72 STATE, use of Silver, vs. P., B. & W. R. R. CO.

Opinion of the Court. . [120

been possible for his horse to have gone faster than it was
going, or whether he miscalculated the distance and speed of
the train and drove in front of it when it was too late for
the engineman to stop or check his engine in time to avoid
the collision. It is true the witnesses said no danger signals
were given, but whether such signals would have been of use
necessarily depends upon when Mr. Silver got on the track
and when he was discovered. It may have been that the
engineman could then see that Mr. Silver had seen the train,
and if so it was more important for him to do all in his
power to check the train, and not stop to give signals of his
approach which would have been useless unless Mr. Silver
was unaware of the approach of the train and could have
hastened the speed of his horse beyond what it was then
going.

The appellants after explaining to Mr. Snyder the condi-
tions, and estimating the speed of the train at fifty miles an
hour, inquired of him, "within what distance could that
train be so slowed down as to reach a given point three sec-
onds later than it would had it continued its speed of 50
miles per hour?" He replied, "About 300 feet; that if the
train was running at the rate of 45 miles per hour his answer
would be 270 and 300 feet." The record does not show
whether his answer was based on a mathematical calculation,
experiments or what, but if it be assumed to be correct, it is
manifest that it could throw no light on the subject in the
absence of proof as to when Mr. Silver started to cross, how
fast he was going and when the engineman discovered him
on the track. The theory of the appellants was that it would
take a horse and buggy so many seconds to go the distance
necessary to clear the track, and that if the engineman had
checked his train Mr. Silver could have escaped. But, as
indicated above, that must depend upon conditions which
were not proven—such as where the engine was when the
horse first got upon the track, how fast it was actually going,
etc.

STATE, USE OF SILVER, vs. P., B. & W. R. R. CO.   73·

Md.]                          Opinion of the Court.

The attorneys for the appellants exhibited commendable zeal and industry in the preparation of their brief in which are cited a large number of the numerous negligence cases which have been before this Court. It will be conceded that the duty of a railroad company to avoid the consequence of a plaintiff's negligence does not depend upon whether it is a steam railroad or one using some other motive power, but the cases in this State clearly point out the difference, in the effect of the rule as to the negligence of the plaintiff and of the defendant, between accidents occurring in a city or other thickly populated locality and those occurring at public crossings in the country or sparsely settled places, one of which is *McNab* v. *United Railways,* 94 Md. 719.

In *Consol. Ry. Co.* v. *Armstrong,* 92 Md. 554, it was contended that this Court had gone further in *McKewen's and Appel's Cases,* 80 Md. 593 and 603, and *Rifcowitz's Case,* 89 Md. 338, in the modification of the rule as to contributory negligence than it had in its former decisions— those cases adding to prayers on contributory negligence such a qualification as "If the defendant's motorman could have avoided the accident by the exercise of due care after he saw *or ought to have seen* the plaintiff's peril," or something to that effect. After answering that suggestion the Court, through JUDGE SCHMUCKER, said: "The modification of the general doctrine of contributory negligence should not be constantly or indiscriminately used in instructing juries in suits for injuries caused by negligence, but its employment should be confined to those cases in which there is testimony placing the defendant or his agent in a situation affording him an opportunity to discover the plaintiff's peril, by the exercise of reasonable care, in time to avert it," and attention was called to the fact that the cases of *McKewen, Appel and Rifcowitz* were cases of injury by electric street cars to persons crossing their tracks at intersecting streets, in which the cars were running at a high rate of speed and it was shown that if the motorman had slackened the speed

and kept the cars under control as they approached the crossings, they could have seen the plaintiffs in time to have prevented the accidents. Hence it was said that in those three cases the evidence plainly called for the form of instruction given by the Court, but it was held that it was not proper in *Armstrong's Case.* It had been previously said in *W. M. R. R. Co.* v. *Kehoe,* 83 Md. 455, that "Every portion of a street railway's track is a public crossing, because persons have the right to cross those tracks at any point along the thoroughfare; and hence the obligation on the part of the company's employees to keep a constant outlook for persons crossing or approaching the tracks extends to the whole line of the road," and in that case in speaking of an accident which happened at or about a public crossing of a railroad in the country, it was said: "As no one has a right to be *negligently* or wrongfully on a railroad track, the company owes no duty to a person so situated to anticipate that he will be in such a position; but if its servants see him in a place of peril, though he be wrongfully or *negligently* there, then the duty arises to avoid injuring him if possible. The duty which the company owes to such a person originates only when the perilous position is seen or known by the company's servants. When, therefore, a plaintiff is wrongfully or *negligently* on the tracks of a railroad in a position of peril * * * the duty of the company to use due care to avoid injuring him arises at the moment the servants of the company see and become aware of his peril; and hence, to sustain this branch of the prayer, it was essential for him to show: first, that the company's servants had knowledge of his peril; secondly, that they had knowledge in time to arrest an injury, and, thirdly, that they failed to exert proper care to avoid the injury after acquiring knowledge of the peril." It is true that the plaintiff in that case was found lying on a siding outside of the crossing, but he contended he was thrown there by reason of his buggy having been struck by the train when on the crossing.

In *Ward's Case,* 113 Md. 649, which is greatly relied on by the appellants, the accident also happened when the plaintiff was driving along one of the streets of the city, and it was said: "The company is not allowed to run its cars along the thoroughfares of the city at the rate of speed permitted in the country, and as they approach a street crossing it is a duty of those in charge of the car to keep a sharp lookout, and, if the car is moving rapidly, to slacken its speed sufficiently to enable them to have the car well under control so as to avoid a collision with any one who may be using the crossing." It was held that if the accident occurred by reason of the failure of the motorman to stop the car, after he saw the appellee or by the exercise of due care could have seen him in the act of crossing the tracks, the company was liable, notwithstanding plaintiff's contributory negligence. In that case there was, however, evidence that the car was running at a high rate of speed, that the plaintiff and his companion looked up and down the tracks before attempting to cross, and also that the motorman was working the lever. A majority of the Court held that it was proper to submit the case to the jury on the question of contributory negligence.

In *Kolken's Case,* 114 Md. 160, which was a suit for injuries for an accident occurring at the crossing of two streets in Baltimore, the rule stated in *Ward's Case* was approved, but after referring to *McNab's Case, supra,* and quoting what JUDGE McSHERRY had taken from *Neubeur's Case,* 62 Md. 401—that "It was not the duty of those in charge of the train to anticipate the conduct of the plaintiff, and because they saw him approach the crossing to conclude that he would attempt to cross in advance of the train"— JUDGE THOMAS also, who delivered the opinion in *Ward's Case,* said: "But, as was distinctly recognized in that case, a very different rule applies to the running of cars on the crowded thoroughfares of a city, where the motorman *is required to anticipate* the conduct of those crossing the

76 STATE, use of Silver, vs. P., B. & W. R. R. CO.

Opinion of the Court. [120

streets to the extent of keeping a sharp lookout, giving proper warning and reducing the speed of his car so as to have it under control for the purpose of avoiding injury to those who may be on the crossing." Judge Thomas also delivered the opinion in *Sparr's Case,* 114 Md. 316, in which the accident happened within the corporate limits of Baltimore, but at a point where "the evidence shows that the surroundings were practically the same as if it had been in the open country outside of the limits of the city," and it was held that the plaintiff was guilty of such contributory negligence as precluded recovery. In speaking for the Court, Judge Thomas said: "The appellant relies upon the class of cases to which the recent case of *United Railways and Electric Company* v. *Ward,* 113 Md. 649, and case of *United Rys. and Elec. Co.* v. *Watkins,* 102 Md. 267, belong. But as has been frequently stated by this Court, those cases have no application to accidents occurring in the open country, where cars are known and permitted to run at much greater speed than is permissible on the crowded thoroughfares of a city, where those in charge are not required to reduce the speed of the car as they approach a road crossing, and where more caution is therefore demanded of persons in crossing the tracks."

The case of *B. & O. R. R. Co.* v. *Welch,* 114 Md. 536 (which was again before this Court in 117 Md. 280), was also relied on by the appellants—particularly the part of the opinion on pages 546 and 547 of 114 Md. That unfortunate lad was killed, however, in Baltimore City, and he was not on a public crossing but was a trespasser. The well established rule as to trespassers was applied in that case, and without meaning to say or intimate that the agents of a railroad company do not owe a greater duty to persons using a public crossing in the country than they owe to trespassers, it can not be said that under our decisions, some of which are cited above, the rule can be as strictly applied to crossings on railroads in the open country as to railways in cities,

STATE, use of Silver, vs. P., B. & W. R. R. CO.   77

Md.]                    Opinion of the Court.

or thickly populated places. It would be impossible for railroad trains or cars to make such speed in long distances as the public demands, if the rule as applied in cases in cities was made applicable to them in the country. There are not the same reasons for so applying the rule, for in the country there is not such constant use of public crossings as there is of streets in cities, there is much better opportunity to see and hear approaching trains and cars, there is generally but little to distract the attention of travellers as compared with what there is in city streets, and other reasons might be given. But conceding that such a modification of the rule as to contributory negligence should be applied in some cases where the accidents occurred at public crossings in the country, there is nothing in the record which would justify us in doing so in this case, or in holding that the case should have been submitted to the jury. As was said in *Benedict* v. *Potts,* 88 Md. 54, quoted in *B. & O. R. R.* v. *Black,* 107 Md. 661: "To entitle a plaintiff to recover in an action of this kind, he must show not only that he has sustained an injury, but that the defendant has been guilty of some negligence *which produced that particular injury."* There is nothing in this case to show that the omission to give the danger signals was in any way responsible for the accident, and the utter absence of testimony to show what did cause it or what efforts the agents of the defendant made would have left the case to mere conjecture and speculation on the part of the jury, if it had been submitted to it. We are therefore of the opinion that the Court was right in not doing so.

We will not discuss the exceptions to the testimony, but will only add that there was no error in any of those rulings.

*Judgment affirmed, with costs to the appellee.*